OPINION OF THE COURT
Gloria M. Dabiri, J.
The defendant Ernest Johnson was indicted for the December 20, 1994 shooting of Oswald Mathews at Mathews’ apartment on Parkside Avenue in Brooklyn. He moves to suppress, as the product of his unlawful detention on an unrelated weapons charge, two guns used in the shooting and delivered to the station house by his wife. He also seeks to suppress admissions made by him on the additional ground that his withdrawal from heroin, together with police conduct during his lengthy detention, coerced his admissions.
The court having determined that the police acted without "probable cause” or "reasonable suspicion” (CPL 140.50; People v De Bour, 40 NY2d 210, 223 [1976]; People v Benjamin, 51 NY2d 267, 270 [1980]) in grabbing the defendant as he walked upon a public street, placing him up against a car and conducting a search which revealed a 9mm firearm, finds that two questions remain: (1) whether the recovery of two additional guns with ammunition, brought by Mrs. Ella Johnson to the station house where the defendant was detained, is sufficiently attenuated from the primary illegality (People v Rogers, 52 NY2d 527 [1981], cert denied 454 US 898) and (2) whether the defendant’s statements regarding the shooting, given some 23 hours following his arrest, were voluntarily made. (CPL 60.45 [2] [b] [i]; People v Anderson, 42 NY2d 35.)
The relevant facts are as follows: On December 27, 1994 at approximately 7:40 p.m. the defendant was arrested by Police Officer Ralph Hanna at Bradhurst Avenue and 144th Street in Manhattan and charged with possession of a 9mm firearm. While en route to the 32nd Precinct, he initiated a conversation with Officer Hanna in which he asked Hanna to let him go and stated that he would help Hanna by bringing in additional guns. They arrived at the precinct at approximately 7:50 p.m. and while Hanna elicited pedigree information, the defendant continued to talk about bringing in additional guns. The defendant, who was "kind of fidgety”, talked continuously and was "over-excited”, told Hanna that he "used” heroin. At 9:05 p.m. Detective Martin Davin read Miranda warnings to *83 the defendant. The defendant indicated that he understood his rights and wished to answer questions. Thereafter, Hanna and Davin spoke with the defendant intermittently until approximately 11:30 p.m. During this period the defendant also was questioned by homicide detectives from the 32nd Precinct. Between 11:30 p.m. and 12:45 a.m. the defendant gave a detailed oral statement to Davin in which he explained where and from whom he had purchased the 9mm weapon and said that he had purchased cocaine from the same location. At approximately midnight, the defendant made two telephone calls: one to his wife and the other to an unidentified male. He told the man that he had been arrested, that he was "working with some good police officers” and that the man should gather the guns and give them to the defendant’s wife. Hanna told the defendant that he would tell the District Attorney’s Office that the defendant was cooperating. At approximately 2:00 a.m. the defendant’s wife arrived at the precinct and the defendant, in Hanna’s presence, instructed her to get the guns. At about 4:00 a.m. she returned to the precinct with a Cobray Mac 11 gun, a .380 caliber pistol and matching ammunition.
At 5:40 a.m. the defendant was transported from the 32nd Precinct to Manhattan Central Booking for arraignment. He complained of being ill and asked to see a doctor. Central Booking, therefore, would not accept him and he was returned to the 32nd Precinct. At 8:00 a.m., Hanna filed a felony complaint on the arrest with the Manhattan District Attorney’s Office. At 9:25 a.m. Warrant Officer John Schupp again transported the defendant to Manhattan Central Booking. At 10:15 a.m. Schupp received a call from Hanna asking that he return the defendant to the 32nd Precinct and Schupp did so.
At 11:45 a.m. Detective Steven Litwin of the Brooklyn South Homicide Task Force learned from Hanna that the defendant, a suspect in the December 20th shooting of Oswald Mathews, was being returned to the 32nd Precinct. Mathews had informed Brooklyn detectives that the defendant shot him and had given Litwin a photograph of the defendant. At about 1:00 p.m. the defendant was questioned by narcotics detectives from Manhattan South. At approximately 2:00 p.m. Hanna purchased a hero sandwich, juice and potato chips and gave them to the defendant. At 4:00 p.m. Detective Litwin and Sergeant Sica arrived at the 32nd Precinct and found the defendant curled up on a bench in the cell.
At 6:15 p.m. Litwin questioned the defendant, asking him about a gun trafficker in Brooklyn. Twenty minutes into their *84 conversation, Litwin told the defendant that he and Sergeant Sica were from Brooklyn and "that [they] knew that [the defendant] had done a shooting in the apartment on Parkside Avenue.” The defendant shook his head "No” and Litwin repeated that they knew he had done it and wanted to hear his version of what had happened. The defendant stated: "He tried to f*** my wife. My wife called me and I went over there.” Litwin then showed the defendant the Miranda waiver, signed the previous evening, and "reminded him that he had waived [his rights], signed the Miranda form and agreed to make a statement.” Litwin then readministered Miranda warnings and the defendant once again indicated that he understood. During the next hour the defendant made statements concerning the shooting. The defendant also told Litwin that he was a heroin user.
At approximately 8:00 p.m., at the request of Detective Richard Colon of the Joint Firearm’s Task Force who was waiting to interview the defendant, Litwin asked the defendant if he would execute a waiver of his right to a timely arraignment and he agreed to do so. At 10:00 p.m. on December 28, 1995 the defendant was transported, a final time, from the 32nd Precinct to Manhattan Central Booking. He was subsequently arraigned on charges related to his December 27th arrest and, thereafter, pleaded guilty to resisting arrest in full satisfaction of the Criminal Court complaint.
On December 29, 1994 at 5:00 p.m. the defendant was examined by a doctor at Rikers Island Correctional Facility. The doctor rendered a diagnosis of heroin withdrawal. The defendant reported to the doctor that he used heroin and complained of stomach pain, diarrhea, vomiting and insomnia. The doctor observed that the defendant was sweating, had goose flesh, watery eyes, a congested nose, hyperactive bowel sounds with diffuse tenderness and was depressed.
The defendant testified credibly at the suppression hearing that he had a history of heroin addiction, that he last used heroin during the afternoon of December 27th and that he had been using heroin, regularly, three times each day. He indicated that upon his arrest he was willing to cooperate "as far as bringing in guns” were concerned, and that he waived his right's and made statements to Hanna and Davin. He testified that "the drug was still in [his] blood then” and that he did not begin to feel ill until after midnight. He testified that he first felt "anxiety” and later was sweating, his stomach was turning, he felt hot and cold, and had diarrhea. He asked to *85 see a doctor and was told by officers that Hanna would arrange for him to be seen by a doctor. He testified that he cooperated at first believing that Hanna would let him go back onto the streets where he could get more heroin; but that upon being transported to Central Booking for the first time he knew that the police were not going to let him go. He denied eating all of the food that Hanna gave to him and said that what he did eat he regurgitated.
Doctor Lawrence Siegel, an expert in forensic psychiatry called by the defendant, identified the symptoms of opioid withdrawal as follows: dysphorie mood, nausea, muscle aches, lacrimation or rhinorrhea (runny eyes and nose), pupillary dilation, piloerection or sweating, diarrhea, yawning, fever and insomnia. Three or more of these symptoms must be present in order to make a diagnosis of opiate withdrawal. Heroin withdrawal symptoms occur within 8 to 12 hours following the last use and gradually subside over a period of five to seven days. Doctor Sanford L. Drob, Chief of Psychological Assessment at Bellevue Hospital, was retained by the People and interviewed the defendant on July 12, 1995. Johnson admitted to Dr. Drob that he understood Miranda warnings but stated "If you don’t want your ass beat you’ll compromise those rights.” Doctor Drob agreed that the defendant was suffering from opioid withdrawal when seen by a physician at Hikers Island and that, at that time, the withdrawal was in the mild to moderate range. According to Doctor Drob, persons experiencing severe opioid withdrawal are in a state of panic, oftentimes extremely aggressive, are uncooperative, sweat profusely, frequently throw up in the presence of others, and have watery eyes and other physical symptoms obvious to those around them.
DISCUSSION

The Guns and Ammunition:

The two guns and ammunition brought to the station house by the defendant’s wife are not sufficiently attenuated from the primary illegality and, therefore, must be suppressed. (Wong Sun v United States, 371 US 471; People v Rogers, 52 NY2d 527 [1981], cert denied 454 US 898, supra.) In determining whether secondary incriminating evidence was acquired by means sufficiently independent of the Fourth Amendment violation so as to have been purged of the illegality, courts have considered these factors: the temporal proximity between the arrest and the evidence; the presence of intervening circumstances; and the purpose and flagrancy of the official *86 misconduct. (Wong Sun v United States, 371 US, at 487, supra; Brown v Illinois, 422 US 590, 603; People v Harris, 72 NY2d 614, 620, 622 [1988]; People v Stith, 69 NY2d 313, 318; People v Conyers, 68 NY2d 982, 983 [1986]; People v Johnson, 66 NY2d 398, 407 [1985].)
The United States Supreme Court in Wong Sun v United States (supra) established the rule that a confession following an illegal arrest need not be suppressed if the police misconduct is sufficiently separable or there are other intervening factors indicating that the confession was not the product of the illegality but of the accused’s own untainted free will. The Court in Wong Sun stated that the appropriate question in such a case is whether, granting establishment of the primary illegality, the evidence to which objection is made "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” (Wong Sun v United States, 371 US, supra, at 488.)
In People v Rogers (supra), the Court found that the acts of confronting the defendant with legally obtained physical evidence and of providing him with an opportunity to speak with his brother were significant attenuating factors precipitating the defendant’s confession. The Court in Rogers noted that the arrest was not "orchestrated in such a manner as to intimidate or provoke defendant so as to overcome his reluctance to communicate with the officers” or designed to provide the police with an opportunity to discover evidence which was not otherwise available, and that the defendant had not been mistreated. (52 NY2d, supra, at 534.)
The Court of Appeals also found attenuation in People v Martinez (37 NY2d 662 [1975]), where police improperly stopped a car in which the defendant was a passenger, observed a gun on the floor and arrested all of the car’s occupants. When questioned about a homicide, the defendant denied involvement and gave the name of an alibi witness. The Court suppressed the gun but not the defendant’s statement, or a knife used in the homicide and independently recovered, stating: "[I]n addition to the dictates of Miranda and the standard of voluntariness, the controlling consideration for determining the admissibility of 'verbal’ evidence obtained pursuant to claimed illegal police conduct is whether law enforcement officers acted in good faith and with a fair basis for belief that probable cause existed for an arrest.” (37 NY2d, at 668, supra.) The Court found that although the initial stop was improper the police acted in good faith upon observing the gun, and that *87 independent evidence linking the defendant to the homicide served to break the causal chain between the unlawful stop and his interrogation. (37 NY2d, at 669, supra.)
Also instructive are those cases in which the identity of a witness, who subsequently testifies against a defendant at trial, has been obtainéd as a result of a Fourth Amendment violation. In these instances courts consider whether the illegally obtained information has been exploited, whether the witness has given the statement or testimony voluntarily, and the temporal proximity between the witness’s statement and the police illegality. (People v Mendez, 28 NY2d 94 [1971], cert denied 404 US 911 [1971]; People v Barksdale, 133 AD2d 770, 771 [2d Dept 1987], Iv denied 70 NY2d 1003 [1988]; United States v Ceccolini, 435 US 268 [1978]; People v Finger, 208 AD2d 645, 646 [2d Dept 1944].) In People v Mendez (supra), the Court noted that "[t]he fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give.” (28 NY2d, at 99, supra.) The People, however, must establish that the testimony was a product of the witness’ free will or that intervening events attenuated the police misconduct from the testimony. (People v Finger, supra.)
Because the People have failed to establish the existence of any intervening factor which attenuated the defendant’s conduct, in arranging for the guns to be produced, from his unlawful arrest and because the defendant’s wife acted at his behest and instruction in bringing them to the station house the additional guns and ammunition must be suppressed. (See, People v Finger, 208 AD2d 645, 646 [1994], supra; People v Eddins, 143 AD2d 355, 359 [2d Dept 1988].) These weapons and ammunition have no incriminating value against the defendant absent evidence connecting the defendant to them. Because the necessary connection is supplied by the defendant’s own conduct, unattenuated from his unlawful arrest, such conduct and the property recovered as a result thereof constitute fruit of his unlawful arrest. (People v Rossi, 80 NY2d 952, 954 [1992].)

The Statement to Detective Litwin:

Courts have long recognized that a variety of techniques may be used to coerce a confession and that, aside from cases involving physical brutality, a determination of involuntari *88 ness may usually best be uncovered by looking at the totality of the circumstances under which the admission came about. (People v Anderson, 42 NY2d 35, 38, supra; Clewis v Texas, 386 US 707, 708 [1967].) While a series of circumstances may each alone be insufficient to cause a confession to be deemed involuntary, collectively such circumstances may have that qualitative or quantitative effect. (People v Anderson, 42 NY2d, supra, at 38 [citing People v Leyra, 302 NY 353, 363].) An involuntary statement includes one which is obtained through means which impair an arrestee’s physical or mental ability to make a choice as to whether or not to make a statement (CPL 60.45 [2] [a]), or by means of a promise or statement which creates a substantial risk that an arrestee might falsely incriminate himself. (CPL 60.45 [2] [b] [i]; People v Chase, 85 NY2d 493, 500 [1995].) The test of involuntariness is whether " 'self-direction is lost and compulsion of whatever nature or however infused propels or helps to propel the confession.’ ” (People v Crowder, 119 Misc 2d 467, 468 [Sup Ct, Kings County 1983] [citing Culombe v Connecticut, 367 US 568, 602 (1961)].) Whether a confession has been coerced, therefore, is to be determined from the perspective of the defendant. (Illinois v Perkins, 496 US 292 [1990].)
Factors to be considered in determining whether a defendant’s statement is voluntary include whether the defendant was subjected to continuous interrogation (People v Benitez, 128 AD2d 628 [2d Dept 1987]; People v Gonzalez, 178 AD2d 850, 851 [3d Dept 1991], Iv denied 79 NY2d 948 [1992]), read Miranda warnings (People v Tarsia, 50 NY2d 1, 12 [1980]) or denied sleep or food (People v Gonzalez, supra; People v Anderson, 42 NY2d 35, 38 [1977], supra). Case law repeatedly has emphasized the effect that "slowly mounting fatigue” may be expected to have on a person’s judgment and will. (Spano v New York, 360 US 315, 322 [1959]; People v Anderson, 42 NY2d, at 40.) The length of the detention (4 LaFave, Search and Seizure § 11.4 [b], at 393 [2d ed 1986]) and the delay in arraignment are additional factors to be considered in assessing the voluntariness of a confession. (People v Hopkins, 58 NY2d 1079, 1081 [1983]; People v Mosley, 135 AD2d 662, 663-664 [2d Dept 1987], Iv denied 71 NY2d 1030 [1988]; People v Beckham, 174 AD2d 748, 749 [2d Dept 1991], Iv denied 79 NY2d 824 [1991].)
In this case, prior to admitting his involvement in the Mathews shooting, the defendant was unlawfully in police custody for almost 23 hours. During this time he was subjected to questioning by various police officers. He was awake for most, if not all, of the night and morning following his arrest. *89 At 5:40 a.m., and again at 9:25 a.m., he was transported to Central Booking for arraignment and each time returned to the precinct without being arraigned. (See, People v Hopkins, 58 NY2d 1079 [1983], supra; People v Lockwood, 44 NY2d 769 [1978].) Moreover, it is noteworthy that the defendant was not offered anything of substance to eat until 18 hours after his arrest. (People v Anderson, 42 NY2d 35, 38 [1977], supra.)
It is undisputed that the. defendant was a heroin addict who had last used heroin sometime prior to 7:50 p.m. on December 27th. It is also undisputed that on December 29th at 5:00 p.m. the defendant was diagnosed as suffering opioid withdrawal. (Compare, People v Frejomil, 184 AD2d 524 [2d Dept 1992], Iv denied 80 NY2d 903 [1992] [only evidence of heroin withdrawal offered was claim on physical condition questionnaire completed several hours after confession]; People v Monzon, 167 AD2d 357 [2d Dept 1990] [while defendant manifested signs of drug withdrawal he was alert and coherent, in custody for two hours and not subjected to prolonged questioning].) Heroin withdrawal symptoms begin to occur within 8 to 12 hours following the last use and subside over a period of five to seven days. Neither intoxication nor heroin withdrawal will render a confession inadmissible unless the state of intoxication or withdrawal has "risen to the degree of mania” (People v Adams, 26 NY2d 129,137, cert denied 399 US 931 [1970]; People v Frejomil, 184 AD2d 524 [2d Dept 1992], Iv denied 80 NY2d 903 [1992], supra) or has "resulted in the sudden loss of [defendant’s] capacity to understand either the nature of his legal rights or the consequences that would follow from their waiver”. (People v Husbands, 171 AD2d 756 [2d Dept 1991], Iv denied 78 NY2d 923 [1991]; People v Frejomil, supra; see also, People v Williams, 62 NY2d 285, 288-290 [1984].) However, the defendant does not allege that he did not understand Miranda warnings or that he failed to appreciate the consequences of a waiver of his constitutional rights. Rather, he contends that his physical condition on the afternoon and evening of December 28th, together with all of the other circumstances of his lengthy detention, were unduly coercive and compelled his admissions to Litwin. The credible evidence, including the undisputed medical evidence, supports this contention.
Litwin’s initial questioning of the defendant concerning the shooting occurred prior to the second reading of Miranda warnings. When a person in custody has been advised of constitutional rights and voluntarily and intelligently waives those rights, the police are not required to repeat the warnings prior *90 to subsequent questioning if such questioning occurs within a reasonable time thereafter and. custody has been continuous. (People v Glinsman, 107 AD2d 710 [2d Dept 1985].) However, here the defendant had been returned from Central Booking twice and, 21 hours after the first warning, was being questioned about a totally unrelated crime which the police had reason to believe he committed. Miranda warnings were not readministered until after the defendant admitted his involvement in this crime. Moreover, before giving the defendant Miranda warnings Litwin reminded the defendant that he had previously waived his rights and confronted him with the prior written waiver. Thus, he in effect suggested to the defendant that having once waived his rights he could not decline to do so again.
Under these circumstances there is at least a reasonable doubt as to whether the defendant on December 28th voluntarily waived his constitutional rights a second time and freely gave statements to Detective Litwin, or whether the waiver and admissions were subtly or otherwise coerced. (Brown v Illinois, 422 US 590, 604, supra; Westover v United States, 384 US 436; People v Adams, 64 AD2d, at 712, supra.) On this record the People have failed to establish that Johnson’s will had not been overborne and his capacity for self-determination had not been critically impaired. (Culombe v Connecticut, 367 US, at 602, supra; People v Anderson, 42 NY2d, supra, at 41.)
CONCLUSION
Accordingly, the gun and ammunition recovered from the defendant incident to his unlawful arrest are suppressed; the two guns and ammunition delivered to the precinct by the defendant’s wife are suppressed; the defendant’s statements to Detective Litwin and Sergeant Sica, the only statements which the People seek to offer at trial, are suppressed; and the motion to preclude identification evidence is denied.