People v Cook (2004 NY Slip Op 50767(U))

[*1]

People v Cook

2004 NY Slip Op 50767(U)

Decided on July 12, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 12, 2004

Supreme Court, New York County
THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff,
against
JERMAINE COOK, Defendant.
3725/03

Edward J. McLaughlin, J.
The court conducted a combined Dunaway/Huntley hearing. Both parties appeared at the hearing under the mistaken impression that only a Huntley hearing had been ordered, causing the prosecution to adduce evidence addressing only the Huntley issues. Following closing argument, but before a decision on the merits of the motion, the court permitted the prosecution to present further evidence on the Dunaway issue. See People v Torres, 257 AD2d 672 (2d Dept 1999); cf People v Williams, 260 AD2d 513 (2d Dept 1999). For the reasons that follow, the court finds that probable cause existed to arrest the defendant on June 25, 2003, and, more significantly, continued to exist into the early morning hours of June 26, 2003. Consequently, the defendant's motion to suppress the various statements he made on June 25th and June 26th is denied.
FINDINGS OF FACT
No dispute exists about the facts of the armed robbery that occurred at a subway token booth in Manhattan on February 14, 2003. The token booth, staffed by the defendant's mother, Rosetta Shepherd, was the site of the robbery and the beating of two transit authority revenue agents who had arrived at her token booth to collect money and tokens. The revenue agents had arrived on the "money train" as was customary, arriving there at about 11:50 p.m. Ms. Shepherd had been on duty for over an hour at the time and was expecting the pick-up. As Ms. Shepherd was passing a receipt form to the agents through an open partition, two armed gunmen appeared. They robbed the agents and beat them. The robbers stole six bags containing money and tokens. They also stole the pistols of the revenue agents. The robbers fled to the street.
Detective Reynaldo Paulino was the lead detective assigned to investigate the robbery and spoke to one of the revenue agents after the robbery. The agent told Paulino that he and his partner were making a regular Friday evening pickup at that booth located at Third Avenue and 53rd Street. He said that Ms. Shepherd had been the token booth clerk there on many prior Friday night pickups. He added, however, that on this occasion, as he came from the train toward the turnstile, he noticed that Ms. Shepherd was using a telephone and looking at him with an odd expression as if she did not recognize him. The agents wore their mandated uniforms. The agent said that he had to pause by the turnstile while his partner used the bathroom.
Once the two men came past the turnstiles and approached Ms. Shepherd, she passed the required receipt to them. The agent noticed though that Ms. Shepherd had not signed the receipt. [*2]The receipt is an integral part of the collection process. The token clerk must sign it, and the revenue agent must have a correctly completed form before a pickup can occur. According to the agent, Ms. Shepherd signed her name to the receipt after the agent pointed out the omission. She passed it back to the agent and then opened the drop box from which the agents were to retrieve the subway proceeds. The drop box is opened by a token agent from inside the booth by removing a pin from the locking mechanism.
Virtually simultaneous with Ms. Shepherd's opening of the drop box, a gunman not wearing a mask, or anything covering his face, appeared to point a pistol at the two agents and telling them not to move. As the second gunman who wore a mask appeared, a fight occurred during which the masked robber inflicted a severe head injury to a revenue agent by striking him with a pistol. Perhaps because of the fight, the robbers fled with only six of approximately sixteen money bags.
Ms. Shepherd called 911 at a point after the robbers had fled. During the robbery, however, she did not sound the extensive alarm system present in that token booth. There are many activation points within the token booth from which a clerk can call for assistance without placing herself in danger or without being observed in calling for help. Incidentally, after making the 911 call, during which Ms. Shepherd mistakenly told police to "hurry-up" because someone had been shot, she sought medical attention and did not return to work for an extensive period of time.
Detective Paulino also spoke by telephone with Ms. Shepherd on the day after the robbery. She said she could not identify the robbers and, in fact, said that she did not know a robbery was occurring. She only could hear some scuffling in front of her booth. Ms. Shepherd said that she was unable to see the source of the scuffling noise because at 5' 3" tall she was too short to observe whatever was happening outside of the booth. She nevertheless admitted hearing a scuffle outside the token booth. Detective Paulino never spoke with Ms. Shepherd in person nor did he speak with her again.
Detective Paulino and the investigating officers quickly surmised that a transit employee had planned the robbery because of the numerous events that had to happen precisely at the point when the gunman appeared in order for a theft actually to occur negated coincidence or luck. Initially, Detective Paulino focused on the revenue agent who had stopped at the subway platform bathroom prior to his coming through the turnstiles. Because that agent had been pistol-whipped and suffered the serious head injury, Detective Paulino soon focused on Ms. Shepherd. After all, Ms. Shepherd had failed to sign the receipt thus disrupting the agents' regular collection routine, thus allowing a robber sufficient time to move down the stairs to the booth; had been using a telephone as the agents emerged from the noisy revenue train; had told Paulino that her facial expression resulted from trying to figure out who was approaching her; and had opened the drop box just before an apparently alerted robber appeared with his gun drawn.
Detective Paulino remembered that revenue agent Smart had said that he had done money transfers with Ms. Shepherd often in the past and yet Ms. Shepherd told Detective Paulino that the reason that she was looking oddly at Smart was that she did not recognize him. Detective Paulino discussed with other detectives the mechanics of the drop chute and the fact that it needs to be opened both from the inside by a token clerk and from the outside by a revenue agent. They factored the approximate time it would take someone to descend the subway stair in the [*3]area where the revenue agents said the robbers appeared. Detective Paulino began to acquire telephone information and biographical information about Ms. Shepherd and her family.
Over the next several months Detective Paulino learned that Ms. Shepherd's son, the defendant, had been in state prison, that her brother was on parole for a robbery in which he struck a victim several times with a pistol, and that both her son and her brother resembled the descriptions provided to the police by the two revenue agents. Detective Paulino also discovered, from telephone company and parole records, that the defendant, his mother and her brother all had cellular telephones in February 2003. Detective Paulino subpoenaed records for those telephones for February 2003 and followed-up to investigate some, but not all, of the telephone calls contained on those records.
Following the robbery, on February 19, 2003, agent Smart participated in creating a sketch of the unmasked robber. The sketch resembled the defendant. Ultimately, Mr. Smart selected the defendant's photograph from an array of six appropriately similar photographs that Detective Paulino showed to him.
Parole records for Ms. Shepherd's brother, Emania Shepherd, show that Mr. Shepherd had a cellular telephone provided to him by his girlfriend. That cell phone was the authorized contact point for his parole officer to use to reach Mr. Shepherd. The defendant also had a cell phone and defendant's sister Sharita Shepherd had a cell phone. At a point, Detective Paulina acquired many of these cell phone records. They disclosed that on February 14th, a few hours before, as well as a few minutes before, the robbery, there was some interconnecting cell phone usage among these three telephones within New York City and especially within Manhattan. Detective Paulino concluded that the cell phones were used in the final coordination and execution of the robbery of Ms. Shepherd's token booth.
On June 25th the New York City Police Department, in conjunction with the New York County District Attorney's Office, obtained search warrants for the defendant's apartment as well as his mother's home. Both Emania Shepherd and defendant were scheduled for parole appearances in Nassau County where they each lived on June 25th. The police made arrangements to arrest each at the Nassau County Division of Parole. Following their arrest the two were kept separately.
Emania Shepherd was arrested on June 25th. He had received an injury to his head around the time of the robbery that he, of course, had to explain to his parole officer. Mr. Shepherd had given what the parole and police officers felt was a fabricated, nonsensical and uncorroborated explanation of where he was, how he received his injuries, and what he did about them. Despite the fact that Shepherd soon would be released and the robbery charges against him dismissed, Detective Paulino and law enforcement felt that Emania Shepherd's preposterous account of his February 14, 2003, activities reinforced their conclusion that Emania Shepherd was the masked robber. Mr. Shepherd denied involvement in the robbery on February 14, 2003.
The defendant was taken into custody at approximately 4:20 p.m. on June 25, 2003, by Nassau County Parole Officers. He received his Miranda warnings at 8:45 p.m. from Detective Robert White of the Manhattan Transit District. Detective White told defendant he was being arrested for a token booth robbery that happened on February 14, 2003, after 4:00 p.m. Detective White showed the defendant the sketch and said, "This is you." The defendant said, "No it's not." Detective White told the defendant about the telephone records and he alluded to other [*4]evidence incriminating the defendant. Defendant starred blankly at White. White told the defendant, "You're a young guy, think about it." Defendant made virtually no response to anything that White told him other than to deny involvement. Then defendant requested a chance to use his cell phone, which the police had not confiscated after either arresting him or reading defendant his rights. He called his girlfriend Dawn and his sister. He left a message for Dawn but was able to speak with his sister, who, shortly after the telephone call, left her mother's home and drove quickly to defendant's apartment.
While still in Nassau County, Detective Paulino spoke with the defendant after defendant made the calls. Defendant stated that on February 14, 2003, he never left Nassau county, had not gone to New York City, but had spent the night at a discotheque with his girlfriend and had possession of his cell phone for the entire night. He denied any involvement in the robbery. Detective Paulino told him that he had been identified in the photograph as having participated in the robbery. 
On June 25, 2003, Detective White had been part of the group of the detectives executing the search warrant at Rosetta Shepherd's home. He had gone there from the parole office after administering the rights to defendant. The execution of the warrant was occurring in the evening and the police took a pizza break. Sharita Shepherd appeared and expressed her displeasure at their eating while disrupting her mother's home. Detective White and Sharita Shepherd spoke for a long period of time on the front steps once Sharita had calmed down.
Sharita Shepherd told Detective White that it was not possible for her mother and brother to have been involved in the robbery. She said she had driven her mother to work that day in a friend's car. Both Detective White and Sharita Shepherd talked about their both having had no dates on Valentine's Day. Sharita Shepherd said she had two children whose father was in prison and that the defendant helped to take care of those children. She said that one of them had an upcoming graduation that the father would miss and that the defendant also would miss if he were in jail. At some point, Sharita said that her mother had Sharita's cell phone the day of the robbery.
The defendant was kept in Nassau County after his arrest until the two search warrants had been executed. Then all of the New York police returned to the city. They left Nassau County around midnight. Detective White drove defendant to the Columbus Circle Transit Police area. He put defendant in a holding cell at about 1:00 a.m. on June 26, 2003.
Transit Authority police regulations require that a police officer observe anyone lodged in a transit district holding cell. As Detective White sat down in the chair in view of the defendant, he asked whether the defendant had "thought about what I said" (meaning the telephone records and the sketch). Defendant said his uncle must have had his phone. White retorted something to the effect, "Is that the best you have been able to come up with after all this time?" "Why don't you start thinking about yourself?" The defendant just looked at White.
At some point, Detective White and defendant began to talk about Sharita's children. The defendant became emotional. Detective White said, "You should help yourself if you want to see the graduation." Detective White said he would be willing to speak to the District Attorney, who was a fair guy. The defendant said he just wanted to go home. White said whether you speak or not, you are not going home. The defendant had at least one tear on his face. Detective White said that he did not believe that the defendant planned the robbery. The defendant sat silently but [*5]after a time nodded affirmatively. Defendant said that he was not going to talk about his mother. He sat silently crying for several minutes.
Thereafter, defendant said that the uncle had planned the whole thing. Detective White told the defendant that the police already knew that and that if White were going to bother the District Attorney at this hour it had to be with information that the police did not know already. At a point during this discussion about his uncle, the defendant volunteered that the uncle had wanted the defendant to help the uncle, Emania Shepherd, rob the Home Depot where the defendant worked. The defendant wanted Detective White to commit law enforcement to a reduced sentence for him and again the defendant expressed a desire to go home. White said he could not make any deal, only an Assistant District Attorney could do so. He said he could not call the District Attorney without new information. The defendant then said he knew where the guns were. Detective White told Detective Paulino to call the Assistant District Attorney. White did not ask the defendant any further questions nor did he direct any further comments at the defendant.
The police telephoned an Assistant District Attorney sometime between 3:00 and 4:00 a.m. but the Assistant did not respond until approximately 6 a.m. Having planned to conduct at least one lineup following the defendant's arrest, the police had obtained fillers and attempted to get the two revenue agents to the Columbus Circle police area to do lineups. The fillers had been obtained by Detective Worthington. Because a lineup was ready to proceed sometime between 4:30 a.m. and 5:00 a.m., the police conducted the lineup even though the Assistant District Attorney had not returned their phone call. The person reviewing the lineup, revenue agent Smart, the same person that selected the defendant's photograph, did not select him in the lineup.
After the lineup Detective Paulino brought the defendant back to the holding cell. Defendant asked Detective Paulino, "What had happened?" The detective said that he was not permitted to tell the defendant the result of the lineup. Defendant was alone in the cell for the next four and one half hours.
The Assistant District Attorney arrived at Columbus Circle shortly before 10:00 a.m. He was briefed on the events. The Assistant District Attorney had been investigating the case for several months and had refused to authorize the police to arrest anyone prior to June 25, 2003. He interviewed the defendant on video tape from about 10 o'clock until it ended about two hours later. Prior to the interaction seen on the tape the Assistant District Attorney administered the Miranda warnings to the defendant. The defendant also acknowledged that he had received the Miranda warnings at the Nassau Parole Office the previous day.
To begin the interview, the Assistant said that he was "here to listen." Defendant asked whether he would be able to go home after speaking, and the Assistant replied, "Well, I think that we need to talk. Don't you think we need to talk?" Defendant stated that "I want to know my situation . . . because as you know I'm in a messed up situation. You know that already. You know?" The Assistant stated that he knew about defendant's criminal history and how he had been arrested, and that defendant had been put in a lineup.
The Assistant asked what defendant would like to talk about. Defendant wanted to know what kind of deal he could obtain by talking: "Well and what kind of deal are we going to do though, like, because I wanted to tell you everything, and I'm . . . still in no position, and I'm telling you, come on man." The Assistant acknowledged that defendant was "in a very tough [*6]situation," and that the police knew a lot about what had happened. The Assistant explained that he would "take into consideration" any information that defendant provided, explaining ". . . we'll take into consideration anything you tell us, and it will help you."
After being told "it will help you," defendant said, "Like what?" The Assistant said that he could not give a precise answer without knowing what information defendant would supply. The Assistant summarized what defendant had told the police so far—that defendant and his uncle had disposed of the gun, that his uncle was involved, and that defendant denied personal involvement in the crime. But the Assistant also suggested that the police had information that defendant was personally involved, and that "there's things about this obviously that . . . you can tell us that would help you, but that's up to you."
Once again defendant pressed the Assistant, saying, "You keep saying it will help me. Like how? Like what's the situation . . . first of all what am I facing?" The Assistant noted that defendant was a young man, but that the crime was "serious" and that one of the treasury agents had been beaten. Defendant denied having beaten anyone and wanted to know what was the least amount of time he faced.
The Assistant told defendant, "You need to talk to me. I'm gonna keep it in mind. I'm gonna consider it." He explained that defendant "might face life if you got the most that you can get. We're talking about twenty-five years in jail. Certainly, if you're talking . . . to me . . . and we make some progress here I have to keep that in consideration of what's your potential sentence. I can't promise you a particular number. I can't tell you a particular sentence, but I can tell you this, that it's something that . . . if I make a promise that I'm gonna keep it."
When defendant again complained that the Assistant "can't make me no promises," the Assistant explained that he first needed to know what information defendant would supply: "What I'm saying to you is that I can't give you a particular number, because I don't know what you're talking about. I don't know what you're prepared to talk to us about. . . . From what I understand you have quite a bit to tell us."
Later, the Assistant explained, "I don't know what you have to say. I mean if you tell me something that can help you, that's gonna help you. I'm telling you now it will help you. I'm . . . saying to you I can't tell you how much it's gonna help you because I don't know. . . . I'm really in the dark about what you have to say about this thing."
Defendant replied, "How do you mean? How you're gonna go when you know everything. Right? You know everything. I gave everything." The Assistant then explained that defendant had information that the police did not have, like how the robbery was planned and what each participant did during the robbery, information that was "important" and would "help the investigation" of the case. Defendant expressed his belief that he could not say anything that would help his situation, saying, "The bottom line, I'm done for anyway."
The Assistant disagreed with defendant, saying, "You're a young man," and "I'm in a position to help you. I'm in a position. . . . I'm the one who makes the decisions about any number of years. I'm the one who make [sic] a decision about everything controlling the case, and I'm the one prepared to help you if you help us." Defendant again asked to know what kind of help the Assistant intended to provide in exchange for some "help."
The Assistant did not directly answer the question. Instead, the Assistant acknowledged to defendant that he was being asked to talk about "people that are close to you." He told [*7]defendant that his uncle had "talked to us," and that his uncle had "tried to talk" defendant into participating in the robbery, at which point defendant affirmatively nodded his head. He denied having helped his uncle dispose of the gun, but admitted being present in his uncle's car when his uncle discarded the gun. The Assistant questioned whether defendant was telling the whole truth about that matter, saying to him, "You're the one that knows. But you don't want to be in a position of him pointing a finger at you. Right? Right?" Defendant answered, "From what you're all saying everything is pointed at me anyway. And everything is pointed at me anyway man." The Assistant then said that he was giving defendant "an opportunity to talk," that it was "his choice," and that he was not trying to "force you or coerce you. I'm not going to make you a promise that I can't keep."
Defendant said that this was the first time that he had spoken one-on-one with an Assistant District Attorney. The Assistant noted that defendant previously had made decisions that had affected his future—having spent time in prison—and that he once again had to make a decision that his future, saying, "In many way it's in your hands." The Assistant said that he was prepared to speak with defendant and "take everything that you say to me in consideration . . . ," and wanted to know "how this got started" and whose idea it was to do the robbery, and who was the "main moving force in this," whether it was defendant or someone else. He then explained that he was "required" by law to take into consideration the fact that defendant provided information: "I'm telling you that I'm going to take into consideration, and that's my promise to you. . . . So I'm prepared to listen . . . and that's your option."
Defendant again complained, "But you don't know how much . . . I'm gonna get? You don't know that?" The Assistant again explained that he could not say "how much time your gonna get because I don't know how much you're gonna tell me. I mean I'm telling you that you can only help yourself . . . from talking to me, and that you're facing a lot of jail. That it's . . . something that will be taken into consideration. And as I've said, it's something that I have to do."
The Assistant next asked defendant to think about whether he could help himself by leading police to the gun that the uncle had disposed: "I'm a man of my word. Now, if you think you can help yourself. If you helping us get a gun off the street that might hurt somebody, you're putting us in a situation where someone doesn't get hurt, you know, in the future. I have to think about that, because that's what I do. So I mean it's . . . up to you and we know there were three guns involved." He then noted that a gun had been stolen from a revenue agent and that "[w]e are very interested in getting that gun back. . . . I can't say much about what you know about the proceeds of the crime are available or if even if any of them are available, but those guns they live on forever. They're just out there . . . So if we get a gun off the street. . . . It's important to us."
Defendant revealed that he was reluctant to trust people and did not want to "trip myself up in something." The Assistant issued the following guarantee: "What I guarantee is that I'll take it into consideration, and that's what we're told to do, and that's what we're allowed to do, but when we make that promise we always do it. Now it's up to you. It really is." Defendant then said, "So you want to know where the gun is at?" Defendant then stated that he only knew the location of one gun, and wanted to know "so if I tell you where it's at then what?" The Assistant said, "[W]e keep going around, and around on this thing. I mean I told you just a few [*8]moments ago that it's important to us to get guns off the street. . . . So that gun doesn't end up killing someone or getting someone hurt or the person that has that gun get killed. You know . . . we know what they're for, you know, and it's gonna help you. I know that. So that's what we're talking about. Now, we'll take it into consideration."
At this point, the detective comments to defendant how the detective was not in a position earlier to make any promises to defendant and that defendant would have to wait for the prosecutor, and that Williams is "the man that can help you out with this." The Assistant again explained, "I can promise you that we will take it into consideration. It's something that we weigh in the whole part of the case. The person that makes the ultimate decision will be me. Nobody above me. Nobody below me. Me. The person you're talking to right now." Defendant then said, "You want the gun. Right?" The Assistant answered yes, and defendant then explained that he was present when the gun was disposed of and proceeded to explain where the gun was dumped. Afterwards, defendant gave a more detailed statement about his participation in the robbery.
CONCLUSIONS OF LAW
Defendant has moved to suppress all of his statements on two grounds. First, he argues that his statements were the product of an unlawful arrest. Second, he argues that his statements were involuntary under CPL 60.45. Both aspects of defendant's motion are denied.
A. The police had probable cause to arrest defendant and keep him in custodial detention.

In deciding the probable cause issue, the court credits Detective Paulino, but not without some reservations. Despite having received a second opportunity to prepare for this hearing after it was reopened, Detective Paulino repeatedly appeared unprepared to testify. He often failed to understand questions asked by the court and the Assistant, and did not know answers to questions about relevant and material matters. Moreover, Paulino appears not to have pursued several potential leads in the case. For instance, Paulino discovered that several cell phone calls had been made after the robbery to malls and stores, but nobody obtained or produced at the hearing, any record of purchases made by any of the suspects in the robbery. Defendant also had a safe in his apartment in which the police discovered $2,645, including $195 in rolled coins and $2,450 in $50 and $100 bills, but the court heard no testimony about whether that money matched an inventory of money taken during the robbery or whether no such inventory exists because of Ms. Shepherd's conduct while on the job. Nevertheless, the court concludes that probable cause did exist for defendant's continued detention.
Probable cause for an arrest does not require proof establishing guilt beyond a reasonable doubt. See People v Bigelow, 66 NY2d 417 (1985). To establish probable cause, the proof must "be at least more probable than not that a crime has taken place and that the one arrested is its perpetrator, for conduct equally compatible with guilt or innocence will not suffice." People v Carrasquillo, 54 NY2d 248, 254 (1981). Probable cause must be measured against the totality of information known to the police. See Maryland v Pringle, ___US____, 124 S Ct 797, 800 (2003). Moreover, the information must be viewed from the standpoint of an "objectively reasonable police officer." Ornelas v United States, 517 US 690, 696 (1996).
[*9]
As the prosecution correctly points out, the police had probable cause to arrest defendant at the Nassau County Parole Office on June 25, 2003. Probable cause existed then based on Agent Smart's photographic identification of defendant as one of the two men who had robbed the token booth. But when Agent Smart did not identify defendant at the lineup, that component of the probable cause evaporated and the police could not have detained defendant for more than forty-five to sixty minutes. See People v Hicks, 68 NY2d 234 (1986); People v Sainsbury, 231 AD2d 746, 746 (2d Dept 1996). And the court would have suppressed all statements defendant made afterward as the fruit of an unlawful detention if police did not possess other information establishing probable cause for an arrest and continued custodial detention. But the reopened hearing establishes that the police had probable cause to arrest defendant even without Agent Smart's identifying the defendant.
Agent Smart's failure to identify defendant at the lineup is not fatal to a finding of probable cause because the police possessed other circumstantial evidence identifying defendant as the unmasked robber. Defendant's physical appearance generally matched the description of the unmasked robber, and the police sketch bore many similarities to defendant. Significantly, the police had compelling proof that the robbers had assistance from an Metropolitan Transportation Authority employee based on the several unanticipatable coincidences that coalesced within seconds of each other to make the token booth robbery possible. And the Metropolitan Transportation Authority employee working in the token booth that was robbed was defendant's mother, Ms. Shepherd. Moreover, she inexplicably could not identify, or even describe, either of the two robbers, a highly suspicious circumstance that further suggested her involvement in the robbery, particularly when she admitted having heard a scuffle outside the token booth, but apparently made no attempt to investigate the scuffle occurring outside her token booth. At the time of the robbery, her brother, defendant's uncle, was on parole for a pistol-whipping robbery and living with Ms. Shepherd. The interconnecting cell phone calls at the time of the robbery or after it, between the cell phones belonging to defendant, his mother, and his uncle, are consistent with their talking to each other to coordinate the robbery. All of these circumstances, while possibly not sufficient to support a conviction, when viewed from the standpoint of an objectively reasonable police office, supplied the probable cause needed to continue defendant's detention after Agent Smart did not identify him.
B. Defendant's statements were voluntarily made.
Defendant's statements to police in Nassau County parole office voluntarily were made after he had received and waived his Miranda rights. See Miranda v Arizona, 384 US 436 (1966). The exculpatory nature of those statements shows that defendant wanted to communicate that information to the police and that those statements were made freely, intelligently, and voluntarily. See Arizona v Fulminante, 499 US 279 (1991); People v Anderson, 42 NY2d 35 (1977). Those statements are not suppressed.
The statements that defendant made before being placed in the line-up viewed by Agent Smart are also admissible. Detective White's questions and statements to defendant before the lineup were an obvious effort by White to elicit an incrimination response. But defendant had already received his Miranda warnings and could be questioned at that time without White having to repeat the warnings. See People v Encarnacion, 259 AD2d 309 (1st Dept 1999). The record demonstrates that those statements also were made freely and voluntarily. See People v [*10]Anderson, 42 NY2d 35.
Defendant's principal arguments for suppression focus on the statements made to the Assistant after Agent Smart did not identify defendant in the lineup. Defendant claims that his statement was involuntary because Detective Paulino and the Assistant misled defendant into thinking that he had been identified at the lineup and that defendant's uncle had given the police information implicating defendant in the robbery. Defendant also claims that his videotaped statement was the product of an implied promise of leniency that rendered the statement involuntary. The court disagrees with both arguments.
A statement is voluntary unless the defendant's will has been overborne so that the statement was not the product of a free and unconstrained choice. See People v Anderson, 42 NY2d 35. Under CPL 60.45, a statement is involuntary if obtained by "a public servant engaged in law enforcement . . . by means of any promise or statement, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself . . . ." As is true in all cases, the voluntariness of a statement depends on the totality of circumstances under which it was made. See People v Anderson, 42 NY2d at 38.
Contrary to defendant's claim, the police need not answer a defendant's questions about his arrest or inform a defendant what evidence exists against that person. Indeed, the police may exaggerate the quantity and quality of evidence against a defendant (see People v Louis, 239 AD2d 435, 435-436 [2d Dept. 1997]) and falsely tell a defendant that he has been implicated by an alleged accomplice (see People v Ingram, 208 AD2d 561 [2d Dept 1994]). Here, the police at most allowed defendant mistakenly to believe that he had been identified by Agent Smart, and that his uncle had implicated him in the robbery. Neither tactic can be deemed fundamentally unfair or likely to induce a false confession. See People v Tarsia, 50 NY2d 1, 11 (1980).
To render a statement involuntary, a promise of leniency must, at minimum, quantify the degree of leniency that will be extended. For example, in People v DeJesus, 63 AD2d 148 (1st Dept 1978), the prosecutor communicated to the defendant that his cooperation would result in a substantial benefit. During questioning, the prosecutor told a suspect that he faced life in prison for committing a murder, but that he could "help himself" if he cooperated and named the other person involved in the shooting. Specifically, the prosecutor promised to give defendant "a break on a lot of time. Life imprisonment is a long, long time. You're only chance is to help yourself is to cooperate." The defendant thereafter made a statement, but the Appellate Division ruled that the prosecutor's promise of a "substantially more lenient sentence if there was cooperation" rendered the statement involuntary under CPL 60.45[2][b][i].
In this case, the prosecutor never even quantified the degree of leniency that would be extended to defendant if he cooperated. Defendant repeatedly pressed the prosecutor to provide a precise sentence that he would receive for cooperating, but each time the prosecutor refused, telling defendant that he could not give a precise number without knowing what information defendant would provide. The prosecutor assured defendant that his cooperation would be "taken into consideration" and would be a factor "weighed" into the decision of what charges to bring and the sentence to be offered, but the prosecutor never gave defendant a precise sentence or any suggestion about how much weight his information would be given. The record shows that the prosecutor led defendant to believe that he would receive some degree of leniency if he cooperated, never told him how much leniency he would be extended. The court thus finds that [*11]the prosecutor's promise did not create a substantial risk of inducing a false incriminating statement. See People v Engert, 202 AD2d 1023 (4th Dept 1994) (statement by officer to defendant that his cooperation would "help him, if anything, in the long run," was not a promise that rendered the statement involuntary). 
The fact that defendant initiated discussion of a deal lessened, if not eliminated, the risk that any promise of leniency would induce a false incriminating statement. The statute protects suspects who have refused to speak, but for an assurance of leniency sufficient to overbear the will not to speak. The statute has little, if any application, once a suspect had decided, of his own free will, before any promises have been made, that cooperating with the police would be in his own self interest. The court recognizes, of course, that the suspect has made cooperation contingent on getting the right price. But in that context the influence of the price received is secondary to the pre-existing circumstances that persuaded the suspect to believe that cooperating with law enforcement was in his self-interest.
Dated:July 12, 2004
J.