*815 OPINION OF THE COURT
William E. Garnett, J.
On July 16, 2008, July 18, 2008 and November 18, 2008, this court conducted a Huntley hearing.
Parole Officer Doris Allen and Police Officer Serdaros testified on behalf of the People and Karma Pair testified on behalf of the defendant. I make the following findings of fact based on the testimony that I find credible:
Parole Officer Allen has been employed by the New York State Division of Parole since August 1993. She was assigned to supervise the parole of the defendant in July 2006. The defendant had been paroled on a burglary conviction. Upon his release, he had signed the conditions of parole which included his consent to a search of his residence, person and property and required him to fully and truthfully answer any inquiry by his parole officer or other representative of the Division of Parole. (People’s exhibit No. 1 in evidence.) When Officer Allen first met with the defendant, the consent to search provision was reiterated to him and he reaffirmed his consent. Mr. Vann gave his residence as 87 East 31st Street in Kings County. No previous searches had been conducted by Officer Allen at the defendant’s residence.
The defendant, as a condition of his parole, was referred to a drug program in November 2006. In December 2006, and January and February 2007, the defendant tested positive for cocaine. On March 15, 2007, Officer Allen, in consultation with parole supervisors and Parole Officer Wynn, decided to do a home visit with the intention of doing a search. At that time, Officer Wynn was assigned to the “Targeted Offender Program” which was then doing visits in cases where the parolees, as the defendant, had been convicted of burglary.
On March 16, 2007, prior to conducting any home visits, Parole Officer Wynn met with Sergeant Devine, Officer Serdaros and Officer Neavedo of the 67th Precinct Anti-Crime Unit who had been assigned to assist him in the execution of the home visits. Parole Officer Wynn had selected the parolees’ homes which would be visited and identified them to the police officers. He also told the police officers the number of people to expect at each home and the crime for which the parolee was on parole. Parole Officer Allen did not participate in the visit or search.
Parole Officer Wynn chose to visit the defendant’s residence at 87 East 31st Street first because it was geographically the *816 closest address to the precinct house. Parole Officer Wynn, in the company of the police officers, knocked on the door of the defendant’s second floor apartment. When the defendant opened the door, Parole Officer Wynn explained to the defendant that he wanted to conduct a parole search of his apartment. After the defendant orally consented to the search, Parole Officer Wynn and the police officers entered the premises. The defendant was directed to sit on a couch which was in the middle of the living room. The defendant was not handcuffed during the search. The defendant’s teenage daughter, who was still in her pajamas, was told to get dressed and to take a seat on the couch.
Parole Officer Wynn then walked into a bedroom to the left of the living room and asked the defendant if it was his room. The defendant replied that it was his room.
Police Officer Serdaros, who was standing directly in front of and to the right of the defendant, had a direct view of Parole Officer Wynn inside the bedroom. The defendant also had a direct view of the Parole Officer. Parole Officer Wynn walked over to an armoire and asked the defendant if it was his. The defendant replied that the armoire was his. Parole Officer Wynn then opened the door to the armoire and asked the defendant if the clothing inside was his. The defendant stated that the clothes were his. Parole Officer Wynn continued his search of the armoire and subsequently removed two large blocks of a white, powdery substance that were vacuum sealed. These blocks “were approximately, one to one and a half (IV2) inches thick and probably about the size of [an] eight by ten.” Parole Officer Wynn asked the defendant what they were. The defendant replied: “You know what that is, it appears to be cocaine” and thereafter acknowledged that they were his. Parole Officer Wynn then collected a large amount of money from various locations in the bedroom.
Officer Wynn continued his search in the living room. At the entertainment center, Parole Officer Wynn opened two doors underneath the television set and pulled out a duffel bag. Inside the duffel bag, he discovered a shoe box that contained a firearm. Parole Officer Wynn gave the firearm to Police Officer Serdaros who put it in his waistband for safekeeping. Police Officer Serdaros was also given the two large blocks of white powder which he put inside the shoe box along with the bullets from the firearm. The defendant was handcuffed and placed under arrest. During the search, the defendant had not been threatened or promised anything to elicit any admissions or *817 statements. There was no evidence of any coercion. In response to pedigree questioning, the defendant admitted that he lived at this address.
From the time the defendant was placed under arrest to the time he was taken to the precinct approximately 10 to 30 minutes passed. During this time, Ms. Karma Pair, the defendant’s daughter’s aunt, had arrived in response to a phone call to pick up the defendant’s daughter. The aunt stood in the living room. The defendant was sitting with his daughter on the couch having a conversation. The defendant was overheard encouraging his daughter to take her school bag, which was in the living room, when she left with her aunt. Officer Serdaros described the bag as a backpack which a child or teenager would normally carry. When the defendant’s daughter picked up the bag and started to leave with it, the police searched the bag. A large amount of money and a couple of sets of car keys were recovered from the bag. The defendant’s daughter had neither a driver’s license nor a car. The defendant’s daughter was about 15 to 16 years old. The defendant’s daughter was placed under arrest. Officer Serdaros explained that the defendant’s daughter was arrested because it appeared that she knew of the situation in the apartment, i.e., the narcotics and firearm and may have played a role in what was going on in the apartment in that she was trying to leave with money and car keys.
After the defendant’s daughter was arrested, the defendant and his daughter were in the same room. No one said anything to the defendant at that time about his daughter’s arrest. The defendant and his daughter were subsequently transported to the 67th Precinct.
Later that day, Parole Officer Allen and Parole Officer Wynn were present with the defendant for approximately IV2 to two hours at the District Attorney’s Office. The defendant’s daughter was also present. Miranda warnings were never administered to the defendant in Parole Officer Allen’s presence. The defendant was told that his daughter could also be charged. Thereafter, the defendant said that: “It’s all mine.” The People conceded that this admission could not be used as evidence-in-chief but sought to use it as impeachment material if the defendant testified at his trial.
*818 Conclusions of Law

Huntley

At a hearing to suppress a statement made to law enforcement officials, the People have the burden of demonstrating, beyond a reasonable doubt, that the defendant’s statement was voluntary in the traditional sense (People v Anderson, 42 NY2d 35 [1977]; People v Huntley, 15 NY2d 72 [1965]) and, if applicable, that the defendant had knowingly, intelligently and voluntarily waived his or her Miranda rights prior to making the statement. (Miranda v Arizona, 384 US 436, 444 [1966]; People v Williams, 62 NY2d 285, 288-289 [1984].)
Miranda warnings are only required when a defendant is subjected to custodial interrogation by law enforcement officials. (Miranda v Arizona, 384 US 436 [1966].) The test for determining whether a defendant was in custody at the time of his statement is whether a reasonable person, in the defendant’s position, innocent of any crime, would have believed that he or she was under arrest. (People v Yukl, 25 NY2d 585, 589 [1969].)
The defendant was not in custody at the time he was asked about the bedroom, the armoire, the clothing and the two large vacuum sealed blocks found inside the armoire. At the time of this questioning, the defendant was sitting on a couch in his living room while Parole Officer Wynn was posing questions from inside the bedroom. The police officers present were merely standing in the living room. They did not have their guns drawn. Moreover, the defendant had not been handcuffed and had not been placed under arrest. Thus, there was nothing in this environment or the questioning of the defendant which would have caused a reasonable person, innocent of a crime, to have believed that he was in custody.
Ordinarily, in a noncustodial setting, law enforcement questioning would not need to be preceded by Miranda warnings to render any responses admissible. (Miranda v Arizona, supra.) However, since this case involves questioning by a parole officer, this finding may not be determinative.
In People v Parker (82 AD2d 661 [2d Dept 1981], affd 57 NY2d 815 [1982]), the Appellate Division, Second Department, ruled that noncustodial admissions made by a defendant to his parole officer without the prior administration of Miranda warnings were inadmissible where the defendant had been arraigned on a felony complaint and was represented by counsel. The Court of Appeals affirmed “for reasons stated in the opinion” of the Ap *819 pellate Division (57 NY2d at 817). A sweeping application of this ruling to proscribe any noncustodial questioning by a parole officer in regard to new criminal activity by a parolee without Miranda warnings would impose a higher standard for admissibility of statements made to a parole officer than obtains when noncustodial statements are made to a police officer. On the other hand, did the holding in Parker merely announce a more narrow rule derived primarily from the right to counsel and/or the entry of counsel in a new criminal matter?
This court is, of course, bound to follow Parker if Parker stands for the proposition that all questioning by a parole officer of a parolee concerning criminal activity must be preceded by Miranda warnings.
Since Parker was decided, the United States Supreme Court has ruled that a parolee’s noncustodial admission of criminal conduct to his parole officer made without the benefit of Miranda warnings is admissible in that the relationship between a parolee and his parole officer is not inherently custodial. (Minnesota v Murphy, 465 US 420 [1984].)
Thereafter, in People v English (73 NY2d 20 [1989]), the Court of Appeals held that a parolee’s statements made to his parole officer while in custody are inadmissible in the absence of Miranda warnings. In commenting on People v Parker (supra), Judge Kaye, writing for the Court, specifically noted that, in Parker, the parole officer knew that criminal charges were pending against the defendant and that the defendant was represented by counsel. (People v English at 24.) The Court of Appeals, in English, explicitly did not decide “whether the nature of the parole officer-parolee relationship is such that even routine noncustodial questioning must be preceded by Miranda warnings if it is concerned with possible criminal activity.” (People v English at 24.)[1] Thus, the necessity of Miranda warnings in the noncustodial parolee-parole officer setting is unresolved and these comments by the Court of Appeals suggest that the Parker case most likely was decided on counsel issues and not on the issue of custody.
In addition, in 1985, in People ex rel. Maiello v New York State Bd. of Parole (65 NY2d 145, 147 [1985]), a parole revoca *820 tion case involving a parolee’s statement, the Court of Appeals had also noted the unresolved issue in the parolee-parole officer context, when the Court wrote: “We are here not presented with the issue of the permissible uses, if any, of relator’s statement in other proceedings (cf. Minnesota v Murphy, 465 US 420, supra; compare, People v Parker, 57 NY2d 815, affg 82 AD2d 661, supra).” By these citations, the Court, at least, acknowledged that the United States Supreme Court’s decision in Minnesota v Murphy (supra) might have some impact on the final resolution of the noncustodial parolee interview issue under state constitutional law.
In People ex rel. Maiello v New York State Bd. of Parole (at 146), the Court of Appeals ruled that a parolee’s admission obtained in violation of his “right to counsel under the State Constitution” would not preclude its use at a parole revocation hearing. The Court noted that, in contrast, “[I]n People v Parker (57 NY2d 815, affg 82 AD2d 661), we held that statements made by a Federal parolee to his parole officer under similar circumstances could not be used in a subsequent criminal prosecution (but see, Minnesota v Murphy, 465 US 420).” (People ex rel. Maiello v New York State Bd. of Parole at 146-147 [emphasis added].) The Court’s reference to Parker as a case with “similar circumstances” further suggests that Parker was a counsel violation decision as was Maiello and not a custody case. The parolee in Maiello was not in custody. Again, the citation to Minnesota v Murphy hints that the Court of Appeals’ ultimate resolution of the Miranda issue in noncustodial parolee-parole officer interviews could be influenced by the Supreme Court’s decision on the federal constitutional issue.
The Parker decision has produced a split in the Appellate Divisions. In People v Newport (149 AD2d 954 [4th Dept 1989]), the Appellate Division expansively applied Parker by ruling that a parolee was entitled to Miranda warnings where the parolee’s noncustodial statements were to be used in a subsequent criminal case. Although the defendant was not in custody at the time of the statements in Newport, the parole officer was aware that a criminal complaint had been lodged against the parolee. The Appellate Division apparently gave no significance to the custodial status of the parolee.
In People v Edwards (154 AD2d 150 [3d Dept 1990]), the Appellate Division agreed that the Parker case stood for the principle that a parolee must be advised of his Miranda rights before any alleged statement concerning suspected criminal *821 activity is admissible at a criminal trial without regard to whether the parolee was in custody.
Despite giving this broad interpretation of Parker, the Third Department rejected the approach taken by the Fourth Department. The Appellate Division, citing Judge Kaye’s opinion in People v English (supra), concluded that the affirmance of Parker by the Court of Appeals had been predicated on the parolee’s representation by an attorney in a pending case. (People v Edwards at 152-153.) The Court found no compelling reason to impose a per se rule on parole officers where a parolee, not in custody, is suspected of new criminal activity. Such a rule, in the opinion of the Appellate Division, would place more rigorous constraints on a parole officer than on a police officer who had focused on a suspect in a criminal investigation. Citing Minnesota v Murphy (supra), the Court concluded: “[W]e decide that the nature of the parole officer-parolee relationship is not such that routine, noncustodial questioning must be preceded by Miranda warnings, even if concerned with possible criminal activity.” (People v Edwards at 153.)[2]
The foregoing discussion and analysis of People v Parker and subsequent cases leads to the conclusion that the Appellate Division, Second Department in Parker did not create a per se rule that any questioning of a parolee by a parole officer concerning criminal activity must be preceded by Miranda warnings to render any statement admissible at a criminal trial. The interpretation of Parker by the Third Department in Edwards was overly broad and is not binding on this court. (Mountain View Coach Lines v Storms, 102 AD2d 663, 664-665 [2d Dept 1984]; People v Greeley, 2001 NY Slip Op 40259[U], *7 n [2001].) If the affirmance of Parker by the Court of Appeals *822 had. endorsed such a per se rule, the Court would not have had to caution that its ruling in English was limited and that the Court had not decided the issue in cases of noncustodial questioning. The Parker holding had two elements, i.e., noncustodial questioning by a parole officer regarding suspected criminal activity, and, second, charges of criminal activity against the defendant and/or his or her representation by counsel. Thus, Parker, while binding in its limited factual context, is distinguishable from this case and thus does not control the result.
The court must next decide whether to follow the ruling in Newport (supra) or in Edwards (supra). (Mountainview Coach Lines v Storms, supra.) As is obvious, this court finds the ruling in Newport overly expansive and contrary to the narrow holding in Parker. Clearly, the reasoning enunciated in Edwards rejecting a per se rule is more compelling as the Appellate Division properly distinguished Parker and its ruling is in conformity with federal constitutional law which permits the noncustodial interrogation of a parolee by his parole officer without Miranda warnings. (Minnesota v Murphy, supra.)
Thus, in this case, the defendant’s statements to Parole Officer Wynn are admissible. While the parole officer suspected that the defendant may have been involved in criminal activity based on his positive drug tests, no charges were pending, no felony complaint had been filed and the defendant’s right to counsel had not attached. The questions asked of the defendant were reasonably related to the officer’s role in effecting an authorized search of the defendant’s apartment and limiting the scope of that search. The defendant was not in custody when Parole Officer Wynn made his inquiries. Therefore, based on the conclusion that People v Parker (supra), is factually distinguishable and relying on People v Edwards (supra), this court finds that the parole officer was not required to give Miranda warnings prior to asking his questions.
The court also finds that the defendant’s response to the parole officer’s questions were voluntary in the traditional sense. The defendant’s answers were not the product of any coercion, threats, promises or deprivation. The defendant was not handcuffed at the time. Thus, the defendant’s motion to suppress his alleged statements in his apartment are denied as his statements were voluntary beyond a reasonable doubt.

. In 1994, in People v Alls (83 NY2d 94 [1993]), a case concerning the issue of whether Miranda warnings should have been administered to a prison inmate during an investigation of possible criminal activity in the prison, Chief Judge Kaye, dissenting in part, argued for a narrow holding, citing this same language in support of her position.

. The lower courts have also divided in the application of the Parker holding. In People v Greeley (2001 NY Slip Op 40259[U] [Nassau County Ct 2001]) and People v McGowan (NYU, Jan. 18, 1996, at 32, col 2 [Suffolk County Ct]), the courts interpreted Parker as having established a per se rule. In Greeley, however, the court found that the defendant was in custody. Thus, the application of Parker seems to have been unnecessary to the decision.
In People v Daniels (194 Misc 2d 320 [Sup Ct, Queens County 2002]), People v Lorenzo (NYLJ, July 5, 2002, at 21, col 3 [Sup Ct, NY County 2002]) and People v Hutchinson (4 Misc 3d 1005[A], 2004 NY Slip Op 50720[U] [Grim Ct, Queens County 2004]), the courts found that noncustodial questioning by a parole officer concerning criminal activity need not be preceded by Miranda warnings. The court in Lorenzo did not address Parker but cited Edwards (supra), Minnesota v Murphy (supra) and English (supra). In Hutchinson and Daniels, the courts, citing English, distinguished Parker as applying only when a parolee has a case pending or has counsel. Thus, absent those facts, these courts concluded that Parker does not compel the suppression of noncustodial statements where Miranda warnings have not been administered.