Fuchsberg, J.
After his first jury had deadlocked, defendant Richard Sylvester Anderson, Jr.’s second trial resulted in a verdict of guilty of murder. The Appellate Division, in reversing that conviction and ordering a new trial as a matter of law, did so essentially on the ground that an incriminating written statement given to the police by the defendant should not have been received in evidence because it was the product of defendant’s unlawful detention.[1]
The People now appeal, the case having been certified for our review by a Judge of this court. On that review, we conclude there should be an affirmance, but on a different, *37 albeit broader, rationale than that articulated by the Appellate Division.
As we see it, the ultimate question for our consideration is whether, as a matter of law, Anderson’s statement must be found to have been involuntary. The determination of that issue requires us to examine the largely undisputed circumstances under which it was made. These circumstances arose out of the death of one William Alexander, whose body, bullet wounds in its head and face, was discovered late in the evening of November 9, 1972.
No more than three hours later, at approximately 1:,00 a.m. on November 10, the police, in the course of what they later described as part of a "roundup” of the decedent’s friends in order to learn of "some of the activities of the victim”, brought Anderson, then 21 years of age, to an "interrogation room” at police headquarters. Though neither the record of the trial nor that of an earlier suppression hearing[2] tender any proof of probable cause for arrest at that time, the police blotter signifying the time of arrests carries the entry of Anderson’s name as of the time of his arrival. He was then kept there without interruption and without arraignment until he signed an incriminatory statement well over 19 hours later. It is not on that fact alone but on the entire course of events that ensued during that time period on which we focus.
For it is a complex of values that is at the heart of the rule, codified in New York as CPL 60.45, that an extrajudicial confession involuntarily made is inadmissible against an accused (Blackburn v Alabama, 361 US 199, 207). Certainly since at least Brown v Mississippi (297 US 278), it has come to be accepted that the requirement for voluntariness of confessions, though heavily influenced by the privilege against self incrimination (Malloy v Hogan, 378 US 1), is essentially a matter of due process. It is basic that "ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and not by coercion prove its charge against an accused out of his own mouth” (Rogers v Richmond, 365 US 534, 541; see, also, Spano v New York, 360 US 315, 320-321). If the State were permitted so to do, if the route of the short cut of a confession could be pursued when it is unaccompanied by *38 its maker’s exercise of free will, the fundamental principle that the burden of proving guilt is on the accuser rather than the accused could all too readily and effectively be thwarted.
However, crucial as the determination of the voluntariness of a confession may therefore be, such terms as "involuntary” and "coerced” are not simple to define. The difficulty is compounded by the fact that they may be used to describe either circumstances that render a confession inadmissible on the ground of its unreliability on the issue of guilt or innocence (see People v Schompert, 19 NY2d 300, 305; cf. 3 Wigmore, Evidence [Chadbourn rev, 1970], § 822) or ones that invoke societal disapproval of police methods so extreme that they offend our notions of fundamental fairness, or because of both (Spano v New York, supra, at pp 320-321; Lisenba v California, 314 US 219; see, also, Allen, The Supreme Court, Federalism and State Systems of Criminal Justice, 8 De Paul L Rev 213, 235; Paulsen, The Fourteenth Amendment and the Third Degree, 6 Stan L Rev 411, 429-430).
Indeed, except in general terms, the test of involuntariness may be easier to apply than to verbalize. A series of circumstances may each alone be insufficient to cause a confession to be deemed involuntary, but yet in combination they may have that qualitative or quantitative effect (see People v Leyra, 302 NY 353, 363). And, considering the variety of techniques that may suggest themselves to interrogators, it may be undesirable to prescribe inflexible and all-inclusive limitations in advance to guide interrogating law enforcement officers on all occasions. Failure to do so would not necessarily permit resort to coercion with impunity. Such tactics, when applied, tend to tell their own tale. In short, aside from a case where descent to physical brutality may make it obvious that a confession is "inherently coerced” (e.g., Brooks v Florida, 389 US 413; Ashcraft v Tennessee, 322 US 143), the involuntariness of an inculpatory statement may usually best be uncovered by looking at the " 'totality of the circumstances’ ” under which it came about (Clewis v Texas, 386 US 707, 708; Fikes v Alabama, 352 US 191, 197).
Nevertheless, in appraising that "totality”, we now necessarily turn to the specific circumstances of which it is composed in this case. We do so, of course, for the purpose of determining whether the People met its burden of proving , that the statement was voluntary beyond a reasonable doubt (People v Yarter, 41 NY2d 830; People v Huntley, 15 NY2d *39 72, 78). If it did, the determination of the factual questions on which it is based would not be subject to our review (People v Yarter, supra; People v Leonti, 18 NY2d 384, 390, cert den 389 US 1007), but whether the proof met the reasonable doubt standard at all is a matter of law which we may decide (People v Leonti, supra, at p 389; cf. People v Jackson, 41 NY2d 146, 152; People v Chapple, 38 NY2d 112, 114).
The circumstances here include the following:
1. The more than 19 hours of detention without probable cause was continuous. The interrogation room contained a table and chairs but no telephone or other means of outer communication. Anderson’s detention was confined to that room. The entire atmosphere was one strange to the defendant. As hour after hour dragged on, almost inevitably it had to take on an air of hostility. None but the police, their image permeated with the authority of the State, were admitted to plaintiff’s presence. In particular, there were no friendly or familiar figures to bolster his morale.. No time for his release was ever suggested.
In the face of such not so subtle pressures, elementary principles of psychology tell us that Anderson, unconsciously at least, had to feel that the police had the right to hold him as they were doing, that he would be regarded as recalcitrant if he failed to answer their questions, that they had all the time in the world to query him and that, if he was to be freed, it would be when his answers had satisfied them. It is no doubt such realities that have caused us to say of unlawful detention that it is "one of the factors to be considered on the issue of voluntariness” (People v Johnson, 40 NY2d 882, 883; cf. People v De Tore, 34 NY2d 199, 208-209; People v Herbison, 22 NY2d 946; Brown v Illinois, 422 US 590).
2. The defendant was deprived of sleep during this entire period. His interrogators, who worked in relays, would take their rest, but when Anderson would as much as doze or nod, they immediately shook him to attention. As he had been transported to police headquarters an hour after midnight, his hours in the interrogation room must be added to those which had elapsed since the time he had arisen from his bed on the morning of the day before. The result is that at the time of his confession he was probably at the end of a period of over 30 hours without sleep. To this must be added a comparable deprivation of food during the entire interrogation which, extending from 1:00 a.m. to 8:20 p.m., had encompassed at *40 least three normal mealtimes. It was only when his confession was ready to be made and when the effect of his deprivation of food and rest presumably had taken their toll that frankfurters and coffee appear to have been offered to him, almost in the nature of a reward (cf. Davis v North Carolina, 384 US 737, 741).
The potential effect on human beings of the lack of such elemental needs as sleep and sustenance requires no elaboration. Case law repeatedly has emphasized the vital effect that the resultant "slowly mounting fatigue” may be expected to have on a person’s judgment and will (Spano v New York, supra, at p 320; see, also, Greenwald v Wisconsin, 390 US 519, 521 [no food during 12 hours of custody]; Sims v Georgia, 389 US 404, 407 [no food during eight hours of custody]; Clewis v Texas, 386 US 707, 712, supra).
3. The detention was anything but a passive time for the defendant. Questioning continued without let throughout its long duration. It was conducted by a total of eight or nine officers operating in teams. The exhausting effect of such prolonged and persistent cross-questioning on the mental, emotional and physical state of its target is self-evident. Even allowing for appropriate questioning of suspects by law enforcement officers in the course of their investigation of crime (cf. People v De Bour, 40 NY2d 210, 219), the long and incessant nature of the interrogation here cannot be ignored in reconstructing the total picture of what occurred during the preconfession period in this case (Darwin v Connecticut, 391 US 346, 349; cf. People v Roth, 11 NY2d 80, 88-89).
4. As already indicated, the defendant was isolated from friends and family during this entire period. This happened despite persistent efforts by his mother to see him. Having learned that he was in the custody of the police as early as 3:00 a.m., her attempts were at first diverted by official advice that her son would be home shortly; when this promise proved to be an empty one, she presented herself at police headquarters in person at 8:00 a.m. and thereafter, at least once during most of the following 12 or 13 hours, her requests for access to him were denied. This is no small matter, particularly in circumstances where, for the first 13 hours of his interrogation, it is admitted that Anderson was neither advised of his right to counsel or of his constitutional protection against self incrimination. The incommunicado nature of this confinement too is to be weighed in the scales (see People v Carbonaro, 21 *41 NY2d 271, 278; People v Taylor, 16 NY2d 1038; People v Hocking, 15 NY2d 973; cf. People v Townsend, 33 NY2d 37).
5. Finally, the fact that the defendant was not made aware of his right to counsel until the interrogation had been underway for over 13 hours is not without significance on this inquiry. Whatever its legal effect might be for other purposes, it is very pertinent in establishing the climate that prevailed when the combination of events that led to the confession were building up to their denouement (cf. Clewis v Texas, 386 US 707, 709, supra; Davis v North Carolina, 384 US 737, supra; People v Chapple, 38 NY2d 112, supra).
These circumstances, in combination, make it impossible for the trial court’s finding that the defendant’s statement was voluntary to stand as a matter of law. For, on the totality of this record, since the People failed to prove that the defendant’s "will [had not] been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process” Culombe v Connecticut, 367 US 568, 602 [Frankfurter, J.]).
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur.
Order affirmed.

. The Appellate Division resettled its order to indicate that the reversal was on the law alone.

. For some reason, the Appellate Division reversed only the judgment of conviction and did not undertake, as is the usual practice in such a case, to reverse the suppression order as well.