THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL JOHNSON, Appellant. [34 NYS3d 62]—

Appeals by the defendant from (1) a judgment of the Supreme Court, Queens County (Lasak, J.), rendered October 12, 2011, convicting him of attempted murder in the second degree, robbery in the first degree (two counts), assault in the first degree, criminal possession of a forged instrument in the first degree (three counts), criminal possession of a forged instrument in the second degree (two counts), robbery in the second degree, and criminal possession of stolen property in the fifth degree, under indictment No. 2352/09, upon a jury verdict, and imposing sentence, and (2) a judgment of the same court, also rendered October 12, 2011, as amended October 17, 2011, convicting him of unauthorized use of a vehicle in the third degree under indictment No. 1328/11, upon a jury verdict, and imposing sentence. The appeals bring up for review the denial,

after a hearing (Grosso, J.), of that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials.

Ordered that the judgments are affirmed.

At about 10:00 p.m. on May 11, 2009, a 66-year-old chauffeur was robbed at gunpoint, and then shot, in front of his house in Queens. The victim had just finished work and parked his black BMW automobile on the street when a masked man approached, threatened him with a gun, and grabbed the car's computerized key fob from the victim's hand. The perpetrator shot the victim in the chest and the abdomen from about an arm's length away, which ultimately led to the victim becoming completely disabled. Notwithstanding that he shot the victim twice in the torso, the perpetrator continued to fire approximately six or seven more shots before driving away in the victim's BMW. Several people witnessed the carjacking incident.

Three days later, the police received information that the defendant may have been the perpetrator and ascertained his whereabouts. Detectives from the New York City Police Department (hereinafter NYPD) followed the defendant and observed him commit several traffic infractions while driving a GMC Arcadia, and approached him when he stopped at a gas station. Upon inquiry, the defendant stated that the vehicle was a rental, but his name was not on the rental agreement and he did not have a valid driver's license. The detectives arrested the defendant and recovered a Louisiana driver's license, a John F. Kennedy International Airport (hereinafter JFK) identification (hereinafter ID) card, a New York State nondriver ID card, approximately $2,000 in United States currency, and two BMW key fobs. The defendant gave his name as "Michael Johnson," which did not match the name on the Louisiana driver's license and the JFK ID card. Those two cards bore the defendant's photo, but listed the name "Anis Saleh."

After the defendant was transported to the precinct station house, where he was placed—uncuffed—in an interview room, the NYPD learned that the GMC Arcadia he was driving had been stolen and the "VIN plate" had been "re-tagged." They also learned that many of the U.S. dollar bills recovered from the defendant bore the same serial number. In addition, they discovered that one of the key fobs recovered from the defendant belonged to the BMW that was stolen from the victim in Queens, and the other fob belonged to a vehicle reported stolen in Suffolk County. In furtherance of the ever-expanding investigation of the defendant, he was interviewed by three

other law enforcement agencies. Members of the Suffolk County Police Department interviewed the defendant about the other stolen vehicle. The United States Secret Service interviewed him about the suspected counterfeit currency that was in his possession, and concluded that the currency was counterfeit. The Port Authority Police Department interviewed him concerning the JFK ID card, and concluded that the JFK ID card was not valid.

During that same period of time, the lead NYPD detective on the case traveled to the hospital where the victim was recovering from his gunshot wounds, and showed him a photo array which included a photo of the defendant. The victim identified the defendant as the man who shot him and stole his BMW. The detective returned to the station house and obtained statements from the defendant that he was involved in robbing the victim, but the defendant claimed that he was not the shooter. After the defendant's arraignment, the victim identified him at a lineup.

Following a jury trial, the defendant was convicted of numerous crimes, including attempted murder in the second degree, robbery in the first degree (two counts), and criminal possession of a forged instrument in the second degree (two counts). The defendant appeals.

I. Voluntariness of the Defendant's Statements

The defendant contends that the Supreme Court should have suppressed his statements to police on the ground that they were involuntarily given. At a hearing to suppress statements made to law enforcement officials, the People have the burden of demonstrating, beyond a reasonable doubt, that the defendant's statements were voluntary (*see People v Anderson*, 42 NY2d 35, 38 [1977]; *People v Huntley*, 15 NY2d 72 [1965]; *People v Loucks*, 125 AD3d 890 [2015]) and that the defendant knowingly, intelligently, and voluntarily waived his or her *Miranda* rights (*see Miranda v Arizona*, 384 US 436, 444 [1966]) prior to making the statements (*see People v Williams*, 62 NY2d 285, 288-289 [1984]). If the People meet their burden, the defendant then bears the burden of persuasion (*see People v Santos*, 112 AD3d 757, 758 [2013]; *People v Aveni*, 100 AD3d 228, 237 [2012]).

Proof of voluntariness compatible with due process depends upon the particular circumstances—" 'the totality' "—of each case (*People v Guilford*, 21 NY3d 205, 208 [2013], quoting *People v Anderson*, 42 NY2d at 38; *see People v Dunbar*, 104 AD3d 198, 204-205 [2013], *affd* 24 NY3d 304 [2014]). A court must "review all of the surrounding circumstances to see

whether the defendant's will has been overborne" (*People v Mateo*, 2 NY3d 383, 413 [2004]). Moreover, the court's credibility determinations following a suppression hearing "are entitled to great deference on appeal and will not be disturbed unless clearly unsupported by the record" (*People v Baliukonis*, 35 AD3d 626, 627 [2006]; *see People v Mateo*, 2 NY3d at 413; *People v Oliver*, 87 AD3d 1035, 1036 [2011]).

Here, there is no dispute that the defendant was advised of his *Miranda* rights, acknowledged those rights in writing, and then agreed to provide a statement. Further, it is undisputed that the defendant did not request an attorney. In his statement, he admitted that he was involved in the robbery, explaining that he was only a driver and that another man, known as "G," crafted the plan and shot the victim.

Notwithstanding the valid waiver of his *Miranda* rights, the defendant argues that the Supreme Court should have suppressed his statement because there was up to a 33-hour delay between his arrest and his arraignment. The defendant also argues that the People failed to affirmatively prove that he was given food and drink, access to a restroom, or an opportunity to rest during that time. We note, however, that the defendant did not testify that he was denied any of these necessities, and his counsel did not offer any other proof of such deprivation.

While an undue delay in arraignment is properly considered when assessing the voluntariness of a defendant's confession, a delay in arraignment alone does not warrant suppression, as it is but one factor in assessing voluntariness (*see People v Ramos*, 99 NY2d 27, 34-35 [2002]; *People v DeCampoamor*, 91 AD3d 669, 670-671 [2012]). Recently, the Court of Appeals clarified that "the overriding concern is not with *the mere fact that a delay has transpired*, but rather with the effect of an unnecessary time lag between arrest and arraignment on a defendant's ability to decide whether to speak and how to respond to questioning" (*People v Jin Cheng Lin*, 26 NY3d 701, 720 [2016] [emphasis added]). In *Jin Cheng Lin*, the Court of Appeals unanimously affirmed a 3-1 decision of this Court (105 AD3d 761, 761-762 [2013, Hall, J., dissenting]), in which the majority concluded, among other things, that a 28-hour delay in arraignment did not demonstrate that the defendant's statements were involuntary where the delay was attributable to a thorough police investigation and was not part of a "strategically designed plan to permit the defendant to be questioned outside the presence of counsel" (*People v Jin Cheng Lin*, 105 AD3d at 761-762).

In *Jin Cheng Lin*, the Court of Appeals reiterated the maxim that, although an unwarranted prearraignment delay is a suspect circumstance, " 'except in cases of involuntariness, a delay in arraignment, even if prompted by a desire for further police questioning, does not warrant suppression' " (*People v Jin Cheng Lin*, 26 NY3d at 720, quoting *People v Ramos*, 99 NY2d at 35, citing *People v Dairsaw*, 46 NY2d 739, 740 [1978]; *see People v Holland*, 48 NY2d 861, 862-863 [1979]), and emphasized that "a court must give careful consideration to a delay that impacts a defendant's resistance by extending exposure to the pressures of interrogation to the point where a defendant's will bends to the desires of the interrogators, or during which a defendant is led to believe that the only way to end interrogation is by bargaining away legal rights" (*People v Jin Cheng Lin*, 26 NY3d at 720).

In the instant case, the testimony at the suppression hearing demonstrated that approximately 29-33 hours passed between the defendant's arrest and his arraignment and that he provided statements after being in custody for approximately 25-28 hours. Our dissenting colleague ascribes significance to the length of the delay. However, this was not a typical armed robbery case, and we believe that the delay in arraignment was satisfactorily explained. The NYPD coordinated with three other law enforcement agencies to investigate not only the attempted murder and two robbery charges, but also the extent to which the defendant used false identities and counterfeit money in various jurisdictions, before presenting these matters at arraignment, where a judge would be considering the likelihood that the defendant would return to court before setting bail. Notably, prior to obtaining a statement from the defendant, the lead detective traveled to the hospital where the victim was recovering, conducted a photo array identification procedure when the victim became available, and then traveled back to the station house. Under these circumstances, we conclude that the delay in arraigning the defendant was attributable to a thorough and necessary police investigation. Thus, his "detention [was not] prolonged beyond a time reasonably necessary to accomplish the tasks required to bring [him] to arraignment" (*People ex rel. Maxian v Brown*, 77 NY2d 422, 427 [1991]). Further, the record does not otherwise demonstrate that the police unnecessarily delayed the arraignment in order to obtain an involuntary confession (*see People v Guerrier*, 129 AD3d 863 [2015]; *People v Bryan*, 43 AD3d 447, 448 [2007]; *People v Williams*, 297 AD2d 325, 325-326 [2002]; *People v Jackson*, 292 AD2d 466 [2002]; *see generally People v Mateo*, 2 NY3d at 413; *People v Ramos*, 99 NY2d at 34; *cf. People v Jin Cheng Lin*, 26 NY3d at 719).

As for our dissenting colleague's concern about the People's proof regarding whether the defendant was provided with basic necessities of life while at the station house, we share her concern that, although the lead detective periodically checked on the defendant while he was in the interview room, the detective admittedly failed to document the defendant's status during these checks. We agree that the People would have had stronger evidence if they had produced affirmative documentation at the suppression hearing that the defendant ate food, drank water, and had access to the bathroom while he was at the precinct. However, the lack of affirmative proof on these points does not demonstrate that the defendant's partially self-serving statement was involuntarily given. Additionally, the evidence presented at trial did not establish that the defendant's statements were involuntary (*see* CPL 60.45, 710.70 [3]; *People v Williams*, 297 AD2d at 326; *cf. People v Anderson*, 42 NY2d at 39-41).

Viewing this record as a whole, we are not convinced that this case shares the characteristics common to those cases in which "a coercive environment impacted on the voluntariness of a defendant's statements" (*People v Jin Cheng Lin*, 26 NY3d at 724). As the Court of Appeals has observed, those cases "typically involved" not only "deprivation of food, water, and sleep during the course of a prolonged interrogation," but *also* defendants who were "confined and isolated from all but law enforcement personnel," led to believe that they had to "bargain for their right to counsel," and "demonstrate[d] emotional and physical breakdowns" as a result of an overly coercive environment (*id.*). In *Guilford* (21 NY3d 205), one of the cases relied upon by our dissenting colleague, the defendant was detained for almost 50 hours and under constant observation, often in a 10 foot by 10 foot windowless room. The officers themselves said that the defendant in *Guilford* appeared defeated on the second day of interrogation and that he had "given up" (*id.* at 210). Moreover, the defendant confessed in exchange for a lawyer, who finally met with him after three days, and the lawyer described the defendant as emotional and distraught (*see id.*). The facts in the instant case do not rise to the level of those found in *Guilford*. To the contrary, this record demonstrates that the defendant did not provide his self-serving statements due to any coercion by the police, but rather, he provided the statement once he was faced with evidence of his guilt (*see People v Jin Cheng Lin*, 26 NY3d at 725); that is, once he was faced with the victim's identification from the photo array.

Accordingly, contrary to the view of our dissenting colleague,

we conclude that the Supreme Court properly denied that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials.

In any event, even if the Supreme Court erred in declining to suppress the defendant's statements to police, we find that any such error was harmless because the evidence of his guilt, without reference to his statements, was overwhelming and there was no reasonable possibility that the error contributed to the convictions (*see People v Crimmins*, 36 NY2d 230, 237 [1975]; *People v Loucks*, 125 AD3d 890, 891 [2015]).

## II. Missing Witness Charge

Contrary to the defendant's contention, the Supreme Court providently exercised its discretion in denying his request for a missing witness charge as to the victim's son, who witnessed part of the robbery. Where a party fails to produce at trial "a witness who presumably has evidence that would elucidate the transactions," the opposing party may request that the court "instruct the jury that an unfavorable inference may be drawn from the failure of the party to call such witness" (*People v Gonzalez*, 68 NY2d 424, 427 [1986] [internal quotation marks omitted]; *see People v Hall*, 18 NY3d 122, 131 [2011]). "[T]he party seeking the missing witness charge must sustain an initial burden of showing that the opposing party has failed to call a witness who could be expected to have knowledge regarding a material issue in the case and to provide testimony favorable to the opposing party" (*People v Macana*, 84 NY2d 173, 177 [1994]; *see People v Hall*, 18 NY3d at 131; *People v Edwards*, 14 NY3d 733, 735 [2010]; *People v Gonzalez*, 68 NY2d at 427). If the party seeking the charge makes this showing, the burden then shifts to the opposing party to show that "the witness is not knowledgeable about the issue, that the issue is not material or relevant, that although the issue is material or relevant, the testimony would be cumulative to other evidence, that the witness is not available, or that the witness is not under the party's control such that he would not be expected to testify in his or her favor" (*People v Gonzalez*, 68 NY2d at 428 [internal quotation marks omitted]; *see People v Macana*, 84 NY2d at 177; *People v Smith*, 71 AD3d 1174, 1175 [2010]).

Here, the defendant made a prima facie showing that the victim's son could be expected to have knowledge about a material issue and to testify favorably to the People (*see People v Smith*, 71 AD3d at 1175). However, the People countered by demonstrating that the anticipated testimony would be immaterial. The defendant argues that identification was an important issue in this case and, at some point, the victim's

son estimated that the perpetrator was approximately five inches taller than other witnesses had estimated. However, this record demonstrates that identity was ·not seriously contested in this case. The victim, who interacted with the perpetrator for several minutes before he was shot, offered a detailed description. The victim was able to describe the perpetrator's eyes, nose, skin color, and build, and he was able to compare the perpetrator's height to his own while standing an arm's length away from him. Moreover, the victim positively identified the defendant in a photo array and an in-person lineup. We note that multiple eyewitnesses testified that the scene of the robbery was illuminated by a streetlight.

In addition to the powerful identification evidence offered by the victim, the victim's wife witnessed the shooting and offered a description of the perpetrator's height and build that was consistent with the description provided by her husband. Similarly, a neighbor who witnessed the shooting from three car lengths away testified as to a similar description of the perpetrator's height and build. In addition to this eyewitness testimony and the defendant's statement to police, physical evidence connected him to the robbery and shooting. Among other things, the defendant was arrested while in possession of the key fob to the victim's BMW. In light of the extensive and well-corroborated identification evidence in this case, the testimony of the victim's son as to the narrow issue of the defendant's height would have been immaterial. Accordingly, contrary to the view of our dissenting colleague, we find that the Supreme Court providently exercised its discretion in denying the defendant's request for a missing witness charge (*see People v Edwards*, 14 NY3d 733, 735 [2010]; *People v Morris*, 159 AD2d 934 [1990]; *cf. People v Williams*, 10 AD3d 213, 217 [2004], *affd* 5 NY3d 732 [2005]).

III. Prior Bad Acts

The defendant also argues that the Supreme Court erred in denying his motion for a mistrial, made on the ground that certain trial testimony from witness Carlos Nicholls, who helped the defendant dispose of the gun used in the robbery, suggested that the defendant was involved in uncharged crimes.

"Evidence of uncharged crimes is inadmissible where its only purpose is to show bad character or propensity towards crime" (*People v Arafet*, 13 NY3d 460, 464-465 [2009]; *see People v Molineux*, 168 NY 264 [1901]). Here, the People do not dispute that Nicholls (hereinafter the cooperating witness) improperly provided certain testimony suggesting that the defendant was

involved in the commission of various uncharged crimes. However, the People argue that the Supreme Court appropriately struck the problematic testimony, thus ameliorating any prejudice to the defendant, and properly denied his motion for a mistrial.

In considering a motion for a mistrial, a court " 'must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate' " (*Arizona v Washington*, 434 US 497, 514 [1978], quoting *United States v Jorn*, 400 US 470, 486 [1971]). In balancing these considerations, a court should consider "the availability of less drastic means of alleviating whatever prejudice may have resulted" from the error (*People v Young*, 48 NY2d 995, 996 [1980]). The decision whether to grant a mistrial lies within the sound discretion of the trial court, which is in the best position to determine whether a mistrial is necessary to protect the defendant's right to a fair trial (*see People v Ortiz*, 54 NY2d 288, 292 [1981]; *People v Reaves*, 112 AD3d 746, 747 [2013]). Thus, the trial court's "evaluation of the likelihood that the impartiality of one or more jurors may have been affected" will be accorded "the highest degree of respect" (*Arizona v Washington*, 434 US at 511; *see Matter of Enright v Siedlecki*, 59 NY2d 195, 200-201 [1983]; *People v Michael*, 48 NY2d 1, 9-10 [1979]; *Matter of Romero v Justices of Supreme Ct., Queens County*, 237 AD2d 292, 293 [1997]).

Contrary to the view of our dissenting colleague, we find that any prejudice to the defendant was ameliorated when the Supreme Court sustained his objection to the improper testimony by the cooperating witness, struck that portion of his testimony, and provided a curative instruction, which the jury is presumed to have followed (*see People v Dubois*, 116 AD3d 878 [2014]; *People v Miller*, 78 AD3d 733, 734 [2010]). Accordingly, the court providently exercised its discretion in denying the defendant's motion for a mistrial.

IV. Late Disclosure of Evidence Related to the Cooperating Witness

Further, we do not believe that the defendant was deprived of a fair trial merely because the People temporarily withheld information regarding the cooperating witness pursuant to an ex parte protective order issued by the court (*see People v Rivera*, 295 AD2d 455, 455-456 [2002]).

During the pretrial proceedings, the People moved for a protective order with respect to the discovery of certain

information. In considering this application, the Supreme Court closed the courtroom and heard testimony from a witness. After expressing its general reservations about the issuance of protective orders, the court granted the People's motion and sealed the record, concluding that it was "completely warranted under the facts and circumstances" of the case. Prior to jury selection, the People moved ex parte pursuant to CPL 240.50 for a new protective order, or to extend the prior protective order, in order to delay the disclosure of the identity of the cooperating witness for his protection.

However, at the conclusion of jury selection, the People provided defense counsel with evidentiary materials regarding the cooperating witness, including a seven-page cooperation agreement, a two-page proffer agreement, seven pages of interview notes, and a list of prior convictions. Defense counsel made several motions for a mistrial on the ground that she was taken by surprise because she did not learn the identity of the cooperating witness until after jury selection and she was not provided with related materials in a timely fashion. The Supreme Court denied each of the motions.

Notwithstanding that the People withheld the identity of the cooperating witness, the People turned over various materials related to this witness as they became available. Furthermore, the record reveals that defense counsel was able to effectively use this material insofar as she vigorously cross-examined the cooperating witness at trial. We also note that, after a request by defense counsel, the trial was adjourned for the afternoon following the cooperating witness's direct testimony to permit counsel to work on her cross-examination. Upon viewing the entirety of the record, we find that the defendant failed to show that he suffered prejudice from the delay in disclosing the existence of the cooperating witness and related materials (*see People v Jingzhi Li*, 104 AD3d 704, 705 [2013]; *People v Uka*, 92 AD3d 907, 907 [2012]; *see also People v Aviles*, 119 AD3d 871, 872 [2014]; *cf. People v West*, 271 AD2d 806, 806-807 [2000]).

## V. Remaining Contentions

The sentence imposed was not excessive (*see People v Suitte*, 90 AD2d 80 [1982]).

The defendant's remaining contentions raised in his pro se supplemental brief are without merit. Sgroi, Cohen and Maltese, JJ., concur.

Hall, J.P., dissents, and votes to reverse the judgments, grant that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials, and order

a new trial, with the following memorandum: I respectfully dissent because, in my view, the cumulative effect of certain errors, which occurred both at the pretrial suppression hearing and at trial, require a reversal of the defendant's judgments of conviction.

"It is the People's burden to prove beyond a reasonable doubt that statements of a defendant they intend to rely upon at trial are voluntary. To do that, they must show that the statements were not products of coercion, either physical or psychological, or, in other words, that they were given as a result of a 'free and unconstrained choice by [their] maker' " (*People v Thomas*, 22 NY3d 629, 641 [2014] [citations omitted], quoting *Culombe v Connecticut*, 367 US 568, 602 [1961]).

I have no disagreement with the majority's recitation of the facts of this case. However, based on these same facts, I conclude that the People failed to meet their burden of establishing the voluntariness of the defendant's statements beyond a reasonable doubt. As acknowledged by the majority, the People presented no direct evidence that the defendant ate, drank any water, slept, or had access to the bathroom during the up to 33-hour period of his detention at the precinct station house. There was no evidence presented that the defendant even had the opportunity to eat, sleep, drink, or use the bathroom during that time period (*see People v Guilford*, 21 NY3d 205, 210 [2013]; *cf. People v Brown*, 120 AD3d 954, 955 [2014]; *People v Bonds*, 118 AD3d 717, 718 [2014]).

Where, as here, there is a delay of up to 33 hours between the time a defendant is arrested and arraigned, and where that defendant is interrogated by multiple law enforcement agencies, it is my view that the People must present evidence to demonstrate that the defendant was provided access to food, water, a bathroom, and sleep, in order to establish that any statements, which were the product of such custodial interrogation, were made voluntarily. Such evidence is part of the People's burden. Indeed, in *People v Jin Cheng Lin* (26 NY3d 701 [2016]), a recent Court of Appeals case relied on by the majority, the People presented direct evidence that the defendant's "basic human needs were provided for because he was able to eat, drink, and take bathroom breaks" during his period of detention of over 24 hours (*id.* at 725). The defendant in *Jin Cheng Lin* was even allowed to smoke cigarettes (*see id.*). In contrast, there was no such evidence presented here.

The majority's determination, which affirms the denial of that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials, effectively

places the burden on a defendant to show, in the first instance, that he or she was *not* provided with basic necessities of life such as food, water, and the opportunity to use a bathroom during the period of detention and custodial interrogation. This burden shifting violates the well-settled principle that it is the People's burden to prove beyond a reasonable doubt that statements of a defendant they intend to rely upon at trial are voluntary (*see People v Thomas*, 22 NY3d at 642). Accordingly, I find that the Supreme Court should have granted that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials.

In addition, Carlos Nicholls, a cooperating prosecution witness who was with the defendant shortly before the carjacking, improperly suggested, during his trial testimony, that the defendant had committed other, uncharged crimes, and had a "bad character or propensity towards crime" (*People v Morris*, 21 NY3d 588, 594 [2013]). Contrary to the majority's conclusion, however, I do not believe that the Supreme Court's curative instruction was sufficient to ameliorate the prejudice to the defendant caused by Nicholls's improper testimony. The jury heard detailed testimony from Nicholls about how he and another individual, designated as "Accomplice A," whom the jury could readily conclude was the defendant, stole cars and created fake identification cards and fraudulent documents. This suggested that the defendant had a criminal propensity to commit crimes involving stolen cars and fake identifications, which were the crimes underlying the attempted murder, robbery, and assault charges at issue here. Furthermore, some of these uncharged crimes were identical to the criminal possession of a forged instrument counts. Under these circumstances, despite the court's instruction not to consider the letters designating the accomplices, the impermissible suggestion that the defendant had a propensity to commit theft crimes could not have been ignored by the jurors. "A court's instructions to a jury to disregard matters improperly brought to their attention cannot 'always assure elimination of the harm already occasioned'" (*People v Calabria*, 94 NY2d 519, 523 [2000], quoting *People v Carborano*, 301 NY 39, 42 [1950]).

I am also troubled by the fact that Nicholls's existence was not even disclosed to the defense until the conclusion of jury selection. This prejudiced the defendant in that defense counsel was not provided with an opportunity to question prospective jurors about their attitudes toward cooperating witnesses who receive a benefit from the government in exchange for their testimony. Then, in piecemeal fashion, the prosecutor gave

defense counsel Nicholls's statements and minutes of his guilty plea, in which he admitted possessing the gun used to shoot the complainant in this case. Under these circumstances, the delayed and piecemeal disclosure of *Rosario* material (*see People v Rosario*, 9 NY2d 286 [1961]) prejudiced the defense by not allowing a meaningful opportunity to investigate Nicholls and his potential identity as the man who shot the complainant (*see People v Wagstaffe*, 120 AD3d 1361, 1364 [2014]; *People v Roberts*, 203 AD2d 600 [1994]).

The People maintain that they properly delayed disclosure of Nicholls's existence and the related discovery materials pursuant to a protective order. This is troubling to me as well, since, based on the record before this Court, it cannot be determined if the Supreme Court providently exercised its discretion in issuing the protective order.

Furthermore, contrary to the majority's determination, I find that the Supreme Court erred in denying the defendant's request for a missing witness charge with respect to the complainant's son. The witnesses at trial estimated the assailant's height to be between five feet eight inches and 5 feet 10 inches. The complainant's son, however, who was an eyewitness to the crime, described the assailant as being six feet one inch or six feet two inches. Thus, the complainant's son's description of the assailant, which was up to five inches taller than the descriptions given by other witnesses, went directly to a material issue pending in the case, i.e., the identity of the assailant, and differed materially from the descriptions provided by the People's witnesses (*cf. People v Miller*, 282 AD2d 691 [2001]).

Under these circumstances, the defendant made an adequate prima facie showing that the complainant's son was knowledgeable about a material issue in the case, that he could be expected to testify favorably to the People, and that he was available and in the People's control. In response, the People failed to meet their burden of establishing that a missing witness charge would be inappropriate (*see People v Gonzalez*, 68 NY2d 424, 428 [1986]; *People v Days*, 131 AD3d 972, 974 [2015]). Contrary to the majority's conclusion, I do not find that the testimony of the complainant's son as to the assailant's height would have been immaterial. As indicated above, the testimony of the complainant's son would have differed materially from the testimony of the other prosecution witnesses regarding the assailant's height and, if such testimony was introduced, the resolution of the differing testimony would have been placed squarely before the jury. Consequently, the

defendant's request for a missing witness charge should have been granted.

Moreover, it is my opinion that these cumulative errors cannot be considered harmless, as the evidence of guilt was not overwhelming (*see People v Crimmins*, 36 NY2d 230, 241-242 [1975]; *People v Days*, 131 AD3d at 981). Specifically, the People's evidence as to the defendant's identity as the carjacker and shooter was not overwhelming, as the assailant wore a mask concealing his entire face except for his nose and eyes. In any event, the errors deprived the defendant of a fair trial.

Accordingly, I vote to reverse the judgments, grant that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials, and order a new trial.