People v Essic (2024 NY Slip Op 51517(U))

[*1]

People v Essic

2024 NY Slip Op 51517(U)

Decided on November 13, 2024

Supreme Court, Kings County

Daniels-DePeyster, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 13, 2024
Supreme Court, Kings County

The People of the State of New York

against
Regimald Essic, Defendant.

Indictment No. 73607-23

Nahal Batmanghelidj, Esq. and Julie Schaul, Esq. of the Legal Aid Society for the defendant
ADA Kirsten J. Tamayo for DA Eric Gonzalez, Kings County District Attorney's Office 

Claudia Daniels-DePeyster, J.

The defendant, who is charged with Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03(3)) and other related charges, moves to suppress the firearm recovered from the defendant's vehicle and statements allegedly made by the defendant to law enforcement. On July 3, 2024, this Court conducted a combined Dunaway/Mapp/Huntley hearing.[FN1]
The People called two witnesses: Police Officer Keon Lawson and Sergeant Matthew Salzman. Additionally, the People introduced four exhibits. The defendant did not present any witnesses but did introduce two exhibits. 
Based upon the testimony at the hearing, the submissions by the parties and the applicable law, the motion to suppress is DENIED in part and GRANTED in part. I. FINDINGS OF FACT
As a preliminary matter, the Court finds that the witnesses were credible.
A. Police Officer Keon Lawson
Police Officer Keon Lawson has been with the New York City Police Department (hereinafter "NYPD") for approximately seven-and-a-half years and is currently assigned to the Neighborhood Community Service division of the 75 Precinct, where he "answer[s] minute jobs, such as parking problems [and] noise complaints" (Tr. at 7-8).
On May 20, 2023, Officer Lawson was in uniform in an unmarked vehicle with his partners, Sergeant Berardi and Officer Varrone (Tr. at 8-9, 22, 28). At approximately 12:40 a.m., [*2]the officers' vehicle was at the intersection of Stanley and Autumn avenues in Kings County, where "six to eight car lengths" away, Officer Lawson "observed a grey . . . sedan, driving at a high rate of speedy going northbound on Autumn Avenue" (Tr. at 9). He specified that there were twenty-five miles per hour speed limit signs posted in the area, but that he observed Officer Varrone, who was the driver of their vehicle, "do at least thirty-five to forty to catch up to the vehicle" (Tr. at 9). Officer Lawson also indicated that the sedan was heavily tinted, specifically that he could not see into the vehicle except through the front windshield (Tr. at 9, 11, 40). He then observed the same grey sedan "go through a stop sign on Autumn and Loring," make a right turn without signaling, heading east on Loring Avenue, and make a U-turn in the middle of the block before pulling into a parking spot (Tr. at 10). There were no other cars on the road at the time (Tr. at 10). When the sedan was reversing into the parking spot, the officers activated their lights and attempted to pull it over (Tr. at 11-12).
After the sedan pulled into the parking spot, the driver, identified as the defendant at the hearing, exited the vehicle, closed the door, and began to speed walk away (Tr. at 11 -12). According to Officer Lawson, the car was legally parked (Tr. at 28). Officer Lawson and Sergeant Berardi both exited their vehicle and told the defendant to "stop" in a "loud, clear command[ing] voice," but the defendant "continued to walk [away]" (Tr. at 12). The officers had to "physically grab [the defendant] and bring him back to the vehicle" because it was "a traffic stop" and the defendant was "not free to go" (Tr. at 13). The officers asked the defendant "for paperwork for the vehicle and his I.D.," but despite being asked "six or seven times," the defendant refused (Tr. at 13, 25). Officer Lawson placed the defendant under arrest for obstructing governmental administration (hereinafter "OGA") for "refusing a lawful order to provide documents that is required if you're driving a vehicle," and for reckless driving (VTL § 1212) (Tr. at 14, 36-37). After handcuffing the defendant, Officer Lawson removed the defendant's keys, phone, and wallet from his pockets and placed them on the trunk of the car (Tr. at 29).
While still on the scene, "[a]n individual who claimed to be the defendant's wife" arrived and stated, "I'm his wife. That is my husband; why are you guys arresting him?" (Tr. at 15, 30). She did not provide the officers with identification or proof of ownership of the vehicle (Tr. at 15). The defendant asked the officers to give the woman "all [of] his property as well as the vehicle" (Tr. at 16, 26). However, the officers did not do so. Officer Lawson said that it is at "the officer's discretion" and that "it's not normal practice by NYPD to release property on the scene" (Tr. at 27). The officer said that in the circumstances where an individual is arrested, it is normal practice to "bring everything back to the precinct and voucher it" (Tr. at 27). The officer further indicated that he impounded the vehicle because he arrested the defendant for OGA and reckless driving and no other reason (Tr. at 37)
Officer Lawson then transported the vehicle back to the precinct, where it was vouchered for safekeeping and was to be inventoried, which he defined as "a term that the NYPD came up with to document and account for all valuables in the vehicle, including the vehicle, since it's in NYPD custody" (Tr. at 16, 37). He went on to say that "the whole process is just to document and account for all of the items, valuable in the vehicle" (Tr. at 41). At the precinct, Sergeant Salzman "conducted the inventory search, he opened up the glove compartment and took out a towel and in the towel was a wrapped gun in it" (Tr. at 16-17, 42).
B. Sergeant Matthew Salzman
Sergeant Matthew Salzman has been with the NYPD for nine years (Tr. at 49). As a sergeant, he supervises police officers during routine patrols and assists "on their day-to-day" (Tr. at 49).
On May 20, 2023, Sergeant Salzman was working with his partner, Officer Reid, at the 75 Precinct when he became involved with this case (Tr. at 50). Specifically, he "assisted with doing an inventory of the vehicle" (Tr. at 50, 52). The sergeant indicated that he knows how to conduct an inventory search via the "Patrol Guide procedure," which "gives you a basic understanding of how an inventory can be conducted" (Tr. at 53; see People's Exhibit 2 — NYPD Patrol Guide § 218.13). Sergeant Salzman conducts his inventory searches "the same pretty much every single time" in that he "will almost always start with the driver's side, starting from the front driver's side door, then . . . the rear driver's side, then . . . the front passenger side, then the rear passenger side and then the trunk" (Tr. at 58). When searching the defendant's car, the Sergeant found "a red jacket in the back seat" and "some more clothes . . . on the driver's side" among other things (Tr. at 59). When he opened the glove compartment, he "was met with various documentation for the vehicle and there was a red cloth, a shirt or a bandana," wrapped around a gun (Tr. at 59, 65; see People's Exhibit's 3-A through 3-F - Invoices). When he made that discovery, he said "Ricky," which was the "code word for gun," to alert Officer Lawson (Tr. at 59). The sergeant also ran information on the defendant, whom he identified at the hearing, and learned that the defendant had a suspended driver's license (Tr. at 51).
II. CONCLUSIONS OF LAW
On a motion to suppress evidence, the prosecution has the initial burden of going forward to demonstrate the legality of the police actions and must introduce credible evidence to meet this burden (People v. Hernandez, 40 AD3d 777 [2d Dept. 2007]; see People v. Berrios, 28 NY2d 361, 369 [1971]). The Court makes the following conclusions of law:
A. Dunaway/Mapp
For the Dunaway/Mapp prong of this hearing, the initial burden of proof rests with the People to put forward credible evidence tending to show that law enforcement acted lawfully. The defendant has the burden of proving by a preponderance of the evidence that the police acted unlawfully (see People v. Baldwin, 25 NY2d 66 [1969]; see People v. Parker, 180 AD3d 1072 [2d Dept. 2020]). The Court must determine whether the police action was "justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place" (People v. Wheeler, 2 NY3d 370, 374 [2004]).
i. The StopThe defendant argues that there is an "inadequate, non-conclusory factual basis in the record from which this Court can conclude that there was probable cause for the stop" (July 31, Tr. at 5). The Court disagrees.
It is well settled that the police may lawfully stop a vehicle where the officer has reasonable suspicion to believe that the driver violated the Vehicle and Traffic Law (see People [*3]v. Ingle, 36 NY2d 413, 415 [1975] ("A single automobile traveling on a public highway may be stopped for a 'routine traffic check' when a police officer reasonably suspects a violation of the Vehicle and Traffic Law"); see People v. Perez-Lopez, 29 Misc 3d 1218(A) [Sup. Ct. Bx. Co. 2010] ("[i]nterference with a moving vehicle is a seizure requiring, at a minimum, reasonable suspicion")). This is true even if the stop is made by officers not assigned to traffic duty (see, e.g., People v. Woods, 64 NY2d 736 [1984] (traffic stop for expired registration made by anti-crime unit)). Additionally, "a police officer may, as a precautionary measure and without particularized suspicion, direct the occupants of a lawfully stopped vehicle to step out of the car" (People v. Garcia, 20 NY3d 317 [2012]).
Officer Lawson observed the defendant drive through a stop sign in violation of New York State Vehicle and Traffic Law (hereinafter "VTL") § 1172(a) (see, e.g., People v. Davis, 32 AD3d 445 [2d Dept. 2006]); speed in violation of VTL § 1180-a; and fail to signal in violation of VTL § 1163. He also observed the vehicle to have excessive tints in violation of VTL § 375(12—a)(b)(see, e.g., People v. Nektalov,  NE3d-, 2024 WL 2192784 [May 16, 2024]; see People v. Biggs, 208 AD3d 1340 [2d Dept. 2022]), which the defense argues the officer could not have possibly assessed from his position in his car (July 31, Tr. at 6). Excessive window tint is a violation of VTL § 375(12—a)(b) and states that "[n]o person shall operate any motor vehicle upon any public highway, road or street: ... the sidewings or side windows of which on either side . . . are composed of, covered by or treated with any material which has a light transmittance of less than seventy percent," subject to certain exceptions not applicable here (id. § 375[12—a][b][1]). Here, Officer Lawson testified at the suppression hearing that he could tell the window tints were too dark because he could not see into the vehicle. The legal test, according to the Court of Appeals, is whether the police officer reasonably believes the windows to be over-tinted in violation of VTL § 375[12—a)[b] (see People v. Estrella, 10 NY3d 945 [2008])). The Court credit's Officer Lawson and his testimony that he could not see into the defendant's vehicle. This testimony meets that test.
Having made these observations, "the officer had a reasonable suspicion that defendant may have engaged in criminal activity and was, therefore, justified in directing him to stop for the purpose of conducting a limited investigation" (People v. Morris, 138 AD3d 1239, 1240 [3rd Dept. 2016]; People v. Ellis, 62 NY2d 393, 396 [1984] ("[t]he police officers, observing a traffic infraction, properly followed and stopped defendant and asked him for his driver's license"); see People v. Williams, 137 AD2d 569, 570 [2d Dept. 1988] ("the stop of the vehicle in which the defendant was riding was reasonable since it was based upon the fact that it was being operated with one headlight in violation of Vehicle and Traffic Law")).
ii. Arrest
The defendant argues that there was no probable cause to arrest the defendant. They argue that there was no basis for the allegations of reckless driving or obstructing government administration and that the officers were required to issue the defendant an appearance ticket.
a. Reckless Driving
Reckless driving is defined as "driving or using any motor vehicle, motorcycle or any other vehicle propelled by any power other than muscular power or any appliance or accessory [*4]thereof in a manner which unreasonably interferes with the free and proper use of the public highway, or unreasonably endangers users of the public highway" (VTL § 1212). Reckless driving "calls for evidence showing something more than mere negligence" (People v. Grogan, 260 NY 138, 143 [1932]). Rather, the motorist is guilty if he or she interfered with or endangered "the users of the highway [through] the failure to exercise reasonable care, reasonable caution[,] or reasonable foresight of a reasonably prudent and careful person" (People v. Major, 125 NYS2d 747 [Co. Ct. Broome Co. 1953]).
As the defendant pointed out in closing arguments, there was no testimony of endangerment in this case. For instance, there was no testimony that the defendant was overtaking another vehicle at an excessive speed without ascertaining whether the view ahead was clear (see, e.g., People v. Nieves, 71 Misc 3d 130[A] [App. Term 2d, 11th and 13th Judicial Districts, 2021]; see, e.g., People v. Lamphear, 35 AD2d 305 [3rd Dept. 1970]), or that drivers or pedestrians had to move out of the defendant's way to avoid a collision (see e.g. People v. Sticht, 139 NYS2d 667 [Co. Ct. Jefferson Co. 1955]). Therefore, the Court finds that reckless driving was not a valid basis for the arrest of the defendant. However, as discussed supra, the Court finds the arrest valid on another basis.
b. Obstruction of Governmental Administration
The defendant also argues that there was no obstruction of government administration (PL §195.05) and, therefore, no probable cause for the arrest. 
Penal Law §1950.05 provides that:
A person is guilty of obstructing governmental administration when such person intentionally obstructs, impairs, or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function by means of intimidation, physical force or interference, or by means of any independently unlawful act (PL § 195.05[1]).
Specifically, the defendant argues that "there was no intimidation or physical force or interference" and that "failure to provide identification is not an independently unlawful act" (July 31, Tr. at 8). In support of this argument, they cite People v. Alston, where the court found that the defendant's refusal to supply his license, registration, and insurance car" was not an independently unlawful act within the meaning of PL §195.05 (People v. Alston, 9 Misc 3d 1046 [Crim. Ct. NY Co. 2005]). Even if this Court were to agree that the failure to provide identification were not an independently unlawful act, the Court aligns with the prevailing decisions of numerous other courts who have found probable cause to arrest a defendant for refusing to provide their license or registration to an officer (see e.g. People v. Ellis, 62 NY2d at 396 ("once it became evident that defendant could not be issued a summons on the spot because of his inability to produce any identification, the officers were warranted in arresting him to remove him to the police station"); see e.g. People v. Copeland, 39 NY2d 986, 986 [1976] ("[w]ithout the available data on which to prepare a uniform traffic summons and confronted [*5]with the driver of a weaving car who possessed no operator's license, we can only conclude that this arrest was warranted"); see e.g. People v. Bohn, 91 Misc 2d 132 [App. Term 2d Dept. 1977] (finding that the operator of a vehicle may be arrested if he "fails or refuses to sufficiently identify himself"); see e.g. People v. Chipo, 64 Misc 3d 129[A] [App. Term 1st Dept. 2019] (probable cause found to arrest defendant for refusing to provide her license and registration to a police officer after her vehicle was observed making an improper left turn); see, e.g., People v. Taylor, 57 AD3d 1504 [4th Dept. 2008] (based on the defendant's failure to produce identification, the police were justified in arresting him)).[FN2]

Therefore, the Court finds that the defendant's failure to provide the officers with any identification provided them with probable cause to place him under arrest. 
c. Appearance Ticket
The defendant argues that the officers were required to issue an appearance ticket to the defendant pursuant to CPL §150.20 and that their failure to do so "is its own independent basis to suppress" (July 31, Tr. at 8).[FN3]

CPL § 150.20(1)(a) states in pertinent part that whenever a police officer is authorized to arrest a person without a warrant for an offense other than a class A, B, C, or D felony, he shall instead issue an appearance ticket (CPL § 150.20[1][1]). However, there are several exceptions to this rule. An officer is not required to issue an appearance ticket if "the person has been given a reasonable opportunity to make their verifiable identity and a method of contact known and has been unable or unwilling to do so" (CPL § 150.20[1][b][iii]). Nor is an officer required to issue an appearance ticket if "the person is charged with a crime for which the court may suspend or revoke his or her driver's license" (CPL § 150.20[1][b][vii]).
In support of their argument, the defense directs the Court to the Matter of Alfred B. (77 Misc 3d 602 [Fam. Ct. NY Co. 2022]). In Alfred B, the respondent and a companion were stopped by the police after they crossed the street against the light. When the officer asked the respondent for his ID, he responded that he was 16 years old and did not have an ID. The respondent "was cooperative and readily gave the officer his name, his father's name, and his address and repeatedly asked the officer to 'check out' the information he provided" (id. at 603). Without making any attempt to verify the information provided, the officer placed the respondent in handcuffs and searched him for weapons and contraband. A firearm was recovered [*6]from the respondent's jacket pocket. The court suppressed the firearm, holding that the recovery was a violation of CPL § 150.20, specifically noting "that when presented with an accused who, although lacking a photo ID, is cooperative and provides information regarding his identity, the officer may not immediately take that person into custody. Rather, the officer must first make reasonable attempts to verify the identity of the accused based upon the information provided" (id. at 609).
Here, the defendant refused to provide any such information and was far from "cooperative." Though the statute provides that "[t]here is no requirement that a person present photographic identification in order to be issued an appearance ticket in lieu of arrest where the person's identity is otherwise verifiable" and that "an officer shall accept" a government-issued identification of various kinds "as evidence of identity," the defendant, in this case, failed to show any identification whatsoever (CPL § 150.20). Officers cannot be expected, as the defense would suggest, to go through the defendant's property on the scene to verify his identity. First, going through the defendant's wallet to recover his ID, whether it be a driver's license, credit card, or otherwise, would raise significant search issues. Second, even if the officers were to find identification in the wallet, who is to say that the person on the ID or credit card is in fact the person they stopped? Nor would it be reasonable for the officers to simply take the word of another person on the scene as to the identity of the person they have stopped, in this case, the woman who identified herself as the defendant's wife on the scene.
Therefore, this Court finds that the officers were not required to take any further steps to identify the defendant, nor were they required to issue an appearance ticket. The defendant's motion is denied on those grounds. 
iii. Impound and Inventory Search
"When the driver of a vehicle is arrested, the police may impound the car and conduct an inventory search, where they act pursuant to reasonable police regulations relating to inventory procedures administered in good faith" (People v. Walker, 20 NY3d 122, 125[2012] internal citations and quotation marks omitted); see People v. Padilla, 21 NY3d 268, 272 [2013] ("[f]ollowing a lawful arrest of a driver of a vehicle that is required to be impounded, the police may conduct an inventory search of the vehicle"); see People v Noble, 211 AD3d 970). An inventory search is "a search designed to properly catalog the contents of the item searched" (People v. Johnson, 1 NY3d 252, 256 [2003]). The objective of an inventory search is "to protect the property of the defendant, to protect the police against any claim of lost property, and to protect police personnel and others from any dangerous instruments" (People v. Galak, 80 NY2d 715, 719 [1993]; see Florida v. Wells, 495 US 1 [1990]). "The People bear the burden of demonstrating the validity of [an] inventory search" (Padilla, 21 NY3d at 272). When an inventory search of an automobile is challenged, the People must establish that (1) that the vehicle was lawfully impounded, (2) that the search was conducted pursuant to a standardized local police procedure that limits the discretion of the officers in the field, and (3) that the inventory was not conducted as a pretext to search for evidence.
The People bear the threshold burden of demonstrating that the subject vehicle was lawfully impounded at the time of the inventory search, as only a lawfully impounded vehicle may be subject to an inventory search (see People v. Tardi, 28 NY3d 1077 [2016]; see generally [*7]1 Barry Kamins, New York Search & Seizure § 5.05 [2024]). "[T]he decision to impound . . . is properly analyzed as distinct from the decision to inventory" (People v. Rhodes, NYLJ. 4/8/97 [Sup. Ct. Queens Co. 1997] (quoting United States v. Duguay, 93 F3d 346, 351 [7th Cir. 1996]). "The Fourth Amendment's proscription against unreasonable seizures prohibits the police from impounding a car solely because the driver or passenger is arrested" (People v. Miles, 3 Misc 3d 566, 569 [City Ct. Rochester 2003]). The police may impound a vehicle without a warrant "[i]n the interests of public safety and as part of . . . community caretaking functions" (South Dakota v. Opperman, 428 US 364 [1976]).
New York courts have held that police may lawfully impound a car only in carefully circumscribed circumstances. Impoundments are lawful, for example, where there is a reasonable basis to believe that the car itself is evidence of a crime (see, e.g., People v. Boyd, 48 AD3d 1155 [4th Dept. 2008] (holding that impoundment and inventory search of the defendant's van was proper where the victim indicated the involvement of both the defendant and a van, where the defendant was found at a vehicle repair shop where the van was, which was registered to the defendant's wife); People v. Hutson, 270 AD2d 45 [1st Dept. 2000]); where the car was involved in a fatal automobile accident (see, e.g., People v. Quackenbush, 88 NY2d 534 [1996]); where the car is reported or appears to be stolen (see, e.g., People v. Grear, 232 AD2d 578 [2d Dept. 1996]); where a car is abandoned or illegally parked and presents an impediment to traffic (see e.g. People v. Edwards, 163 AD3d 712, 714 [2d Dept. 2018] ("There is no dispute that the subject vehicle was inoperable and creating a hazardous situation, and thus, pursuant to department policy, the officers were obligated to have the vehicle impounded and to conduct an inventory of the vehicle to safeguard the owner's property"); People v. Hanks, 275 AD2d 1008 [4th Dept. 2000]); where the car cannot be operated because it is unregistered, uninsured, or uninspected (see, e.g., People v. Marasa, 284 AD2d 971 [4th Dept. 2001]); or where the car was driven by an unlicensed driver or a driver whose license is suspended, and no one is legally able to drive the car (see, e.g., People v. Jackson, 241 AD2d 557 [2d Dept. 1997] (Defendant's vehicle was properly impounded where neither he nor his passenger had a valid driver's license); People v. Johnson, 298 AD2d 281 [1st Dept. 2002]; People v. Wilburn, 50 AD3d 1617 [4th Dept. 2008] (police could impound a vehicle where the defendant had no valid license and the passenger was unable to drive the vehicle); People v. Willette, 73 AD3d 1278 [3rd Dept. 2010]).
In summary, the decision to impound a vehicle is reasonable if there is a valid reason to move it, a legitimate basis to hold it for further investigation, or if there is no other person present who can safely drive it away.
At the hearing, Officer Lawson testified that the defendant's vehicle was legally parked, and there was no testimony regarding posted time limits pertaining to the parking space (see, e.g., People v. Rivera, 192 AD3d 920 [2d Dept. 2021]). Nor was there any testimony that the vehicle would impede traffic in any way. Although the car was vouchered as "safekeeping," there was no testimony of any vandalism or burglary in the area where the car was parked (see e.g. Tardi, 28 NY3d at 1078 [2016] (vehicle properly impounded where "[u]pon the defendant's arrest, the vehicle would have been left unattended indefinitely in the complainant's private parking lot, which had a history of vandalism, and the complainant requested that the police remove the vehicle")). Though the officers later learned that the defendant's license was suspended, there was no testimony at the hearing that they were aware of this on the scene. Nor [*8]was there any testimony as to issues with the registration, inspection or insurance of the vehicle.
Therefore, under these specific circumstances, the People failed to establish that the impoundment of the defendant's vehicle was in the interests of public safety or part of the police's community caretaking function. "[A]ny determination that the police had to impound the defendant's vehicle due to public safety concerns . . . would be based on mere speculation" (People v. Biggs, 208 AD3d 1340, 135 [2d Dept. 2022] J. Wooten, concurring in part). 
Moreover, the People elicited no testimony or evidence that the police impounded the vehicle under any police regulations, let alone reasonable ones. They presented zero evidence as to whether the NYPD "had a policy regarding impoundment of vehicles, what that policy required, or whether the [police] complied with that policy when [they] impounded the defendant's vehicle." (People v. Weeks, 182 AD3d 539, 541 [2d Dept.202]; see, e.g., People v. Davis, 205 NYS3d 740 [2024]; see, e.g., People v. King, 188 AD3d 721 [2d Dept. 2020] (People failed to present evidence of an NYPD procedure regarding impoundment or whether the officer complied with such procedure when he impounded the defendant's vehicle)). Instead, Officer Lawson merely stated that "it's not normal practice by NYPD to release property on the scene." Thus, this case is distinguishable from Tardi, for example, where the record showed that "the police officers' decision to tow defendant's vehicle ... was properly made in accordance with standard criteria set forth in the police department's written policy" (Tardi, 28 NY3d at 1078). Likewise, in Walker, testimony was elicited from the trooper that it was procedure to tow a vehicle whenever the operator's license was suspended or revoked and the registered owner was not present (Walker, 20 NY3d at 125). While the People did introduce the NYPD policy that governs inventory searches of vehicles into evidence, that policy does not address the initial impounding (see People's Exhibit 1).
Accordingly, the impoundment of the defendant's vehicle was unlawful and the physical evidence that was recovered from the vehicle during the inventory search subsequent to the impoundment must be suppressed as fruits of the unlawful impoundment.
B. Huntley
The People provided notice of a statement made by the defendant to law enforcement personnel that they planned on using in their direct case (see CPL § 710.30[1][a]; see People's Notice and Disclosure Forms). 
A statement made by a defendant may not be used against him during a criminal trial unless it is proven beyond a reasonable doubt that the statement was voluntarily made (see CPL § 60.45[1]; see People v. Huntley, 15 NY2d 72 [1965]); see People v. Grillo, 176 AD2d 346 [2d Dept. 1991]). A statement is deemed to be "involuntary" if it was coerced by the use or threatened use of physical force, or improper conduct or undue pressure "which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement" (CPL § 60.45[2][a]). In a challenge to the voluntariness of a statement, the court must examine the totality of the circumstances under which the statement is made, including the characteristics of the accused and the circumstances under which the statement was made, including the duration and conditions of the detention, the age, physical state and mental state of the defendant, and whether the defendant was provided [*9]food, water, bathroom breaks (see People v. Guilford, 21 NY3d 205, 208 [2013]; see People v. Sakadinsky, 239 AD2d 443 [2d Dept. 1997]; see People v Brown, 113 AD3d 785 [2d Dept. 2014]; see People v. Hall, 145 AD3d 915 [2d Dept. 2016]; see People v. Johnson, 139 AD3d 967 [2d Dept. 2016]).
A statement obtained by law enforcement may also be deemed involuntary if obtained by certain improper promises or statements of fact or in violation of the State or Federal constitution (CPL § 60.45(2)(b)(i) and (ii)). One of those constitutional rights, the privilege against self-incrimination, is protected by the Miranda rule (see People v. Berg, 92 NY2d 701 [1999]). "Because the privilege applies only when an accused is 'compelled' to testify, the safeguards required by Miranda are not triggered unless a suspect is subject to 'custodial interrogation'" (Berg, at 704). "Both the elements of police 'custody' and police 'interrogation' must be present before law enforcement officials constitutionally are obligated to provide the procedural safeguards imposed upon them by Miranda" (People v. Huffman, 41 NY2d 29, 33 [1976]). A suspect is in custody if, in that same situation, a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave (see People v. Harris, 48 NY2d 208, 215 [1979]; People v. Yukl, 25 NY2d 585, 589 [1969]). "The term 'interrogation' under Miranda refers not only to express questioning but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response" (People v. Ferro, 63 NY2d 316, 322 [1984], quoting Rhode Island v. Innis, 446 US 291, 301 [1980]).
The defendant was undoubtedly subject to custodial interrogation by detectives during the debriefing. The evidence at the hearing established that the defendant was given Miranda warnings while in the interview room. He acknowledged his understanding of his rights by answering each question in the affirmative without hesitation. Here, the defendant was not promised anything, threatened or coerced, or handcuffed, and his responses demonstrate a clear understanding of the circumstances.
Accordingly, the Court finds that the People have proven beyond a reasonable doubt that the defendant's statements were made after he knowingly, intelligently, and voluntarily waived his Miranda rights, and the motion to suppress the defendant's statement is denied. 
This constitutes the Decision and Order of the Court.
Dated: November 13, 2024
Kings County, New York

Footnotes

Footnote 1:Closing arguments were heard on July 31, 2024.

Footnote 2:The Court also notes that the officer acted in good faith and his belief was reasonable that the defendant not only violated the Vehicle and Traffic Law, but also that he Obstructed Governmental Administration by refusing to produce any identification or paperwork for the vehicle (see People v. Guthrie, 25 NY3d 130 [2015]).

Footnote 3:"An appearance ticket is a written notice issued and subscribed by a police officer or other public servant authorized by state law or local law enacted pursuant to the provisions of the municipal home rule law to issue the same, directing a designated person to appear in a designated local criminal court at a designated future time in connection with his alleged commission of a designated offense" (CPL § 150.10[1]).